G. R. McCONNELL, as Executor of the Estate of Alvy Dixon, Deceased, LLOYD DIXON, EDITH A. BROKAW, CHARLOTTE P. ROSENLIEB and MARGARET A. LaBEAU, as Legatees and Devisees of Alvy Dixon, Deceased,

*Plaintiffs and Respondents,*

vs.

ROSEMARY DIXON, BRYAN WHITE and FRANCES H. WHITE, his wife,

*Defendants and Appellants.*

(No. 2486; June 26, 1951; 233 Pac. (2d) 877).

302

304

For the defendants and appellants the cause was submitted upon the brief of Sullivan and Sullivan of Laramie, Wyoming, and Brimmer and Brimmer of Rawlins, Wyoming, and oral argument by Mr. J. R. Sullivan and C. A. Brimmer, Jr.

For the plaintiffs and respondents the cause was submitted upon the brief of J. R. Armstrong and Eph U. Johnson both of Rawlins, Wyoming, and oral argument by Mr. Armstrong.

## OPINION

BLUME, Justice.

This is an action to reform a deed made by the Keystone Cattle Company as grantor to Alvy Dixon and Rosemary Dixon as grantees on or about April 29, 1941 for the South Half (S½) of Section Four (4); all of Sections Five (5) and Nine (9); all of Section Seventeen (17), except the Southeast Quarter of the South-

east Quarter (SE¼SE¼); the Southeast Quarter of the Northeast Quarter (SE¼NE¼); the South Half of the Southeast Quarter (S½SE¼) and the Northeast Quarter of the Southeast Quarter (NE¼SE¼) of Section Eighteen (18) all in Township Nineteen (19), North, Range Seventy-eight (78), West of the Sixth Principal Meridian, located in Carbon County, Wyoming, these lands being known as the Murray Ranch. Judgment was in favor of the plaintiffs herein and against the defendants and the defendants have appealed.

The kernel of this case in brief is this: In the winter of 1940-1941 Alvy Dixon, through his son as agent, entered into a contract with the Keystone Cattle Company for the purchase of the Murray Ranch above mentioned for $27,000, one-half to be paid in cash and the other half to be secured by a mortgage. Thereafter and probably in May, 1941 the cattle company sent a warranty deed with Alvy Dixon as grantee, to its attorneys, McCullough and Corthell at Laramie, Wyoming, to be delivered upon payment of the cash and the execution of the mortgage to be signed by Dixon and his wife Rosemary Dixon. The latter refused to sign the mortgage unless her name was included as one of the grantees in the deed. G. R. McConnell acting as legal advisor for Alvy Dixon, in order to complete the transaction, finally inserted her name in the deed, adding to Alvy Dixon who was the grantee, the words "and Rosemary Dixon, husband and wife" thereby creating an estate by the entirety. The controversy in this case rages round the validity of this insertion. Alvy Dixon, then 78 years of age, during this time and from April 12, 1941 to the early part of July was seriously sick in a hospital at Laramie, Wyoming with a heart ailment.

This action was in the first place commenced on April 26, 1944, by Lloyd E. Dixon as the guardian of the per-

son of Alvy Dixon, against Rosemary Dixon and Bryan White as defendants, in which plaintiff claimed that the warranty deed above mentioned be reformed by striking therefrom the name of the defendant Rosemary Dixon and that she be restrained from asserting any claims or ownership in and to the real estate mentioned in the deed and that the defendant Bryan White be required to set up whatever claims he had in and to the property. Alvy Dixon died on November 27, 1944. G. R. McConnell was duly appointed as executor of his estate, and by order of the court he and the four children of the deceased, to-wit: Lloyd E. Dixon, Edith A. Brokaw, Charlotte P. Rosenlieb and Margaret A. LaBeau, legatees and devisees under the will of Alvy Dixon, deceased, were substituted as plaintiffs and on April 4, 1946 the plaintiffs filed a second amended petition against Rosemary Dixon alleging by paragraphs 1 to 4 that: Alvy Dixon died testate on November 27, 1944 leaving real and personal property in Carbon and Albany Counties, Wyoming including the real estate in controversy; that the will of the deceased dated February 10, 1936 was duly admitted to probate on January 15, 1945 and G. R. McConnell was appointed as the executor thereof, and that he duly qualified as such on January 15, 1945; that the four children above mentioned together with Rosemary Dixon were the sole legatees and devisees under the will aforesaid; that on June 21, 1944, however, Rosemary Dixon renounced her claim under the will and elected to take one-fourth of the estate. The remaining allegations are in substance as follows: Prior to April 29, 1941 Alvy Dixon entered into negotiations with the Keystone Cattle Company of Pennsylvania to purchase property hereinabove described. The negotiations resulted in an agreement whereby the above mentioned cattle company agreed to sell to Alvy Dixon, and Alvy Dixon agreed to buy, the property above mentioned for the sum of $27,000, one-

half of which, namely $13,500 was to be paid upon the delivery of a warranty deed to G. R. McConnell, attorney for Alvy Dixon, and the balance to be paid in accordance with four promissory notes secured by a mortgage on the real estate and to be executed by Alvy Dixon payable to John B. Carter as trustee. The deed was duly executed with Alvy Dixon as the grantee on April 29, 1941 and was sent to the attorneys representing the cattle company in Laramie, Wyoming to be held by them until receipt of the down payment and notes and mortgage above described. The sellers prepared a mortgage to be executed by Alvy Dixon and Rosemary Dixon for the purpose of releasing her homestead rights in the real estate. The attorney for Alvy Dixon objected to Rosemary Dixon being made a party to the mortgage upon the ground that her signature was not required. Her signature thereto could not be obtained since she protested against and objected to the purchase of the land, claiming that her husband's land and livestock holdings were sufficient in view of his age and physical and mental condition and that the purchase price should be kept in cash. The sellers, however, refused to accept the mortgage unless Rosemary Dixon was made a party thereto, so the attorney for Alvy Dixon, without the knowledge or consent of his client, presented the mortgage to Rosemary Dixon and requested her to execute it, but she refused to sign the same unless her name was inserted in the warranty deed as one of the grantees. In order to conclude the transaction the attorney for Alvy Dixon, with the consent of the sellers but without the knowledge or consent of his client Alvy Dixon, and solely at the instance and demand of Rosemary Dixon, caused her name to be inserted in the warranty deed as one of the grantees, and Rosemary Dixon thereupon executed the mortgage, and the warranty deed, as altered, named Alvy Dixon and Rosemary Dixon as the grantees therein. The deed and

mortgage above mentioned were thereafter duly recorded with the County Clerk of Carbon County, Wyoming. The purchase price for the real estate including the indebtedness due on the notes and mortgages was paid in its entirety by Alvy Dixon and he was the sole owner of the real estate at the time of his death. He, the said Alvy Dixon, at the time of his death and prior thereto did not know that Rosemary Dixon was a party to the deed. Prior to April 16, 1943, Alvy Dixon, being then 82 years of age, had for some time before been of unsound mind to transact business, and was on the date mentioned judged incompetent, and L. E. Dixon was appointed his guardian. The defendant Rosemary Dixon now claims that because her name was included with her husband's as a grantee that she became the sole owner of the real estate above mentioned upon the death of Alvy Dixon to the exclusion of all other legatees, devisees, and heirs of the deceased. However, she holds the real estate as trustee for the use and benefit of the legatees, devisees and heirs of the deceased including herself: "WHEREFORE, Plaintiff prays that the real estate herein described be adjudged to be held by said Defendant in trust for the use and benefit of the devisees and legatees of said deceased, including the defendant as an heir, and that said Plaintiff, G. R. McConnell as Executor of said estate be authorized to handle said real estate in his fiduciary capacity as an asset of said estate."

The Answer of Rosemary Dixon, admitting the allegations of Paragraphs 1 to 4 of the second amended petition, alleges that the deed to the Murray Ranch was executed to Alvy Dixon and Rosemary Dixon, husband and wife; that it was understood and agreed prior to the purchase of the ranch between Rosemary Dixon and her husband that the ranch was to belong to them as tenants by the entireties, and that she was to be named in

the deed as a grantee; that she protested the purchase of the ranch and refused to sign the mortgage unless her name was inserted in the deed. The answer also alleges that her name was in fact inserted in the deed as a grantee, and that the deed, as changed, was placed on record, and alleges that such alteration was in accordance with the agreement previously had between her and her deceased husband. It is further alleged that the decedent had knowledge of the fact that Rosemary Dixon was named as a grantee in the deed and that the decedent ratified and confirmed this transaction by entering into a written lease dated February 15, 1943, running from Alvy Dixon and Rosemary Dixon, husband and wife, to Bryan White, lessee, covering said ranch.

Subsequently, Bryan White and Frances H. White were, by a supplemental petition, made parties to the action. They answered the petition of the plaintiff in substance claiming to be the owners of the property here mentioned by virtue of a quitclaim deed dated November 27, 1947 made by Rosemary Dixon to Bryan White and Frances H. White.

The trial court entered judgment in the case on January 26, 1950, generally finding for the plaintiffs and against the defendants, and finding the allegations of the second amended petition and supplemental petition to be true. The court made specific findings which are in accord with the allegations of the second amended petition and need not be set out. It further found that Bryan White and his wife accepted the quitclaim deed from Mrs. Dixon heretofore mentioned with knowledge of the pendency of this action, and that said quitclaim deed is null and void and of no effect whatever; that the title to the real estate herein described vested solely in Alvy Dixon at the time of the delivery of the warranty deed above described; that he was the sole owner

thereof at the time of his death, and that said real estate is part of the assets of his estate; that the defendants hold the record title thereto as trustees for the devisees of the said Alvy Dixon, subject to administration of his estate and the charge thereof of the said Rosemary Dixon as provided by the statutes of Wyoming.

Judgment holding the property herein involved to be a part of the estate of Alvy Dixon, deceased, was accordingly entered. It may be here mentioned that Mrs. Dixon had children by a former marriage. She had no children by Alvy Dixon.

### 1. JUDGMENT SUPPORTED BY THE EVIDENCE.

One of the main contentions of appellants is that the findings of the trial court and its judgment are not sustained by the evidence. It is admitted that there is conflict therein, so that we are confronted with the well-known rule that it is for the trial court to resolve that conflict and that we do not interfere. However, the value of the property involved in this case is not inconsiderable. And we shall consider the case in some detail in the light of the foregoing rule. We shall, however, do that in our own way and shall not attempt to answer all the various arguments and various conclusions arrived at by the counsel for the appellants.

Rosemary Dixon testified in part as follows: She discussed the purchase of the Murray Ranch with Alvy Dixon before it was actually bought. She knew of the negotiations which were carried on in connection therewith. Alvy Dixon stated to her sometime in November, 1940 that: "We are going to buy the Murray Ranch and we will buy it together." The witness did not think that the land should be bought because "we didn't have the amount of money to pay for it in cash and I didn't like the idea of taking on other lands." But Alvy Dixon

was very anxious to acquire the ranch and stated: "I think we can build it up." The deceased was very seriously ill in the hospital at Laramie, Wyoming commencing with April 12, 1941 but he began to recover about the middle of June, 1941. The witness talked to Mr. McConnell about signing the mortgage. She objected thereto. "I understood that I was to be a party of the purchase, a part of the owner of the Murray Ranch. Mr. Dixon had made me believe that we were buying the ranch together, and * * * when I asked Mr. McConnell if my name was on the deed, Mr. McConnell said, 'no, the deed was made to Alvy Dixon.'" She was sent for at one time to come to Laramie. She talked to Mr. McConnell. He wanted the witness to sign the mortgage. "I asked Mr. McConnell how the deed was to be made, and he said it was to be made to Alvy Dixon, and I told Mr. McConnell that was not my understanding of it, and I wouldn't sign the mortgage." The witness then called Dr. Story and asked him what the condition of Alvy Dixon was. The doctor informed her that he was alright and able to transact business. She then called a taxi and she and Mr. McConnell went to the hospital to Mr. Dixon's room. Mr. McConnell had the mortgage in his possession and then she and Alvy Dixon signed it. That, she said, was on June 27, 1941. "Q Did you talk with Mr. Dixon? A I asked Mr. Dixon how the deed was to be made. Q What did he say? A 'To you and I.' Q Who else was in the room at the time? A Mr. McConnell and I. Q What was done? A I signed the paper. Mr. Dixon signed the paper first, and I signed. Q Now why did you sign the mortgage? A I signed the mortgage because I expected an interest in this Murray Ranch. Q And were you assured that you would get an interest in it? A Indeed. Q By whom? A By the—by Mr. Dixon, in his expression of 'we bought the ranch together', and by Mr. Dixon's expression, 'the deed is to be made to you and I.' Q Now your objection to signing

the mortgage was because you wanted an interest in the ranch? A Yes, indeed."

The witness Bryan White, a defendant and appellant herein, testified that sometime about February, 1943, when he obtained a lease to the property herein involved, Alvy Dixon told him that he had given all the rest of the children fairly sizeable considerations and that he and Rosemary had bought the Murray Ranch so that it could not be touched by the rest of the children. The witness Mrs. C. C. Curzon who had been nursing Alvy Dixon testified that Mrs. Dixon was at the hospital about June 27, 1941 and that she, at Mrs. Dixon's request, brought a pen and ink to the room with which to write. This testimony was introduced to corroborate Mrs. Dixon that she and Alvy Dixon signed the mortgage at the hospital at the same time. She also testified that months afterwards, perhaps in 1943 when the lease of Bryan White came in question, that Alvy Dixon asked her whether or not Rosemary Dixon was trying to sell her interest supposedly in the Murray Ranch.

G. R. McConnell, an attorney at law and legal advisor of Alvy Dixon testified in part as follows: The transaction in connection with the purchase of the property was not completed until the latter part of June and the early part of July, 1941 because of the fact that Alvy Dixon was seriously ill in a hospital from April 12 until the early part of July, 1941 and he was not permitted to see Alvy Dixon until June 27, 1941. The money for the Murray Ranch was all paid by Alvy Dixon and he executed the mortgage for the payment of the balance due on the purchase price on or about June 27, 1941, at which time he also made a check for the cash payment of $13,500. That was done in the presence of Arch La-Beau. Neither Rosemary Dixon nor Mrs. Curzon were present at that time. The deceased at no time stated

that Mrs. Dixon's name was to be inserted in the deed, nor did he ever authorize the witness to insert her name therein. The original owners of the land insisted that Mrs. Dixon should sign the mortgage. The witness took the position that that was not necessary. But, in view of the fact that the owners insisted, he asked Mrs. Dixon numerous times to sign the mortgage but she constantly refused to do so unless her name was inserted in the deed. The witness had drawn the will of Alvy Dixon in which Mrs. Dixon was left one-fourth of the property of the deceased and he finally figured that it would not make any difference if Mrs. Dixon's name was inserted in the deed, not realizing that (under Peters vs. Dona, 49 Wyo. 306, 54 P. 2d 817) an estate by the entirety would be created if the deed were made to husband and wife jointly. So, upon the insistence of Mrs. Dixon, he finally caused her name to be inserted in the deed on or about the 5th or 7th of July, 1941, and after that was done and he had told Mrs. Dixon, she then signed the mortgage. The witness never had occasion to tell Alvy Dixon that her name was inserted in the deed. In fact, he was afraid to tell him when the thing was first done because of his health, fearing that it might result in Alvy Dixon's death. Nor did Alvy Dixon ever see the deed. After it had been filed of record, it was returned to his office and has been there ever since that time.

A .H. LaBeau corroborated the witness McConnell in reference to the signing of the mortgage by the deceased on or about June 27, 1941 and that no one except Alvy Dixon, McConnell and himself were present at that time.

The original mortgage in question is in the record before us. It is signed by Alvy Dixon and Rosemary Dixon. It is witnessed by G. R. McConnell and A. H. LaBeau. It purports to be acknowledged before G. R.

McConnell as Notary Public as of June 27, 1941 by both Alvy Dixon and Rosemary Dixon.

The testimony of Mrs. Dixon and Mr. McConnell is contradictory and cannot be reconciled. The court was bound to reject the testimony of either one or the other. Counsel for appellants argue that the testimony of Mrs. Dixon should be accepted as representing the actual facts in this case. One reason given by them for not accepting the testimony of Mr. McConnell is that he admits in his testimony that he took the acknowledgement of Alvy Dixon and Rosemary Dixon to the purchase money mortgage on June 27, 1941 but that Rosemary Dixon did not actually sign the mortgage until later in July, 1941. They berate him severely. It is, of course, true that McConnell committed an irregularity. If he had stopped to think, he would immediately have known that he should have made a certificate of acknowledgement as to Mrs. Dixon separately. It is probable, and the record indicates, that the mortgage, as it was originally drawn, contained but one certificate naming both Mr. and Mrs. Dixon and McConnell did not take the trouble of changing that and making a separate certificate when he took the acknowledgment of Mrs. Dixon, although, of course, he should have done so. Ordinarily the exact date of acknowledgment is not of vital importance. The main question ordinarily is as to whether or not the acknowledgement was actually taken. It happens that in this particular case it was of no importance at all, as McConnell well knew, since it was not necessary for Mrs. Dixon to waive her homestead rights, in view of the fact that the mortgage was a purchase money mortgage. In any event, the irregularity committed by McConnell—though it furnished Mrs. Dixon a basis upon which to base part of her testimony and it seems a poor basis at that—is not controlling herein. Counsel for

appellants also berate McConnell severely by reason of the fact that he admitted that he inserted the name of Rosemary Dixon in the deed in "violation of his client's trust and confidence." This matter is mentioned in the brief of appellants so often and in terms that are bitter, and they seem to rely upon this matter to so large an extent for a reversal of the judgment herein, that a passing notice in that connection is perhaps required of this court. The measure of censure to be cast upon McConnell must be determined by the facts and circumstances in the case and the intention with which he acted. He had nothing to gain by inserting Mrs. Dixon's name in the deed. He sought no gain. We have discovered no selfish or evil motive that might have actuated him, nor has any been pointed out by appellants. He was under pressure to see that the transaction was completed, not only by reason of the severe illness of Alvy Dixon, but also by reason of the fact that as hereafter mentioned, Lloyd E. Dixon's purchase of another tract of land could be completed. He sought for some time—a month as Mrs. Dixon testified in one place—to have the transaction completed exactly as intended. It was only by reason of the behavior of Mrs. Dixon in refusing to sign the mortgage that he finally, as a last resort, thinking, as he testified, that it would not change the situation, resorted to that "violation of his client's trust and confidence." He made a mistake, it is true, but we doubt, after reading the record before us, that his action deserves that ultra definitive censure bestowed upon it by counsel for appellants. In fact, it took courage on his part, which not all attorneys might have had, to acknowledge the mistake that he made. In any event, Mrs. Dixon must share the blame for any violation of trust and confidence equally with McConnell. The case hardly presents a situation as counsel for appellants would have us believe, where an innocent, unworldly woman was imposed upon by a learned counselor at

law. It seems that she was asked to sign the notes connected with the transaction (see below), but she shrewdly refused to sign them, taking no risk of sustaining any possible loss. True, she had the legal right to refuse to sign them, and the legal right to refuse to sign the mortgage even though that might frustrate the anxious wishes of her husband. And if she had stood on her legal rights, no one could complain. But she had no right to induce or attempt to induce McConnell to commit an unauthorized act, or be a party thereto, and the mere fact that what she did was by indirection, rather than directly, does not absolve her from sharing the responsibility of the act with McConnell.

The record contains a number of facts and circumstances which the trial court doubtless considered as rather persuasive, if not conclusive, that the testimony of Mr. McConnell in its essential particulars was true and correct. In the first place McConnell testified that Mrs. Dixon never saw the deed, but the latter in answer to Question 900 stated that she saw the deed in question in December, 1941 and that her name was inserted in the deed with a pen. The original deed is in evidence in this case and it discloses clearly that her name was inserted by a typewriter rather than a pen. Again she was rather inconsistent in some of her testimony in attempting to show that she saw Alvy Dixon on June 27, 1941 when according to her testimony he told her that the deed was made to "you and I." She was asked: "Q How many times, prior to that day (June 27, 1941) had Mr. McConnell talked to you about signing the mortgage—frequently? A No. Q Just a few times? A Yes, just a few times. Q During what period of time was it? Over two months, a month, a week? A I believe more than a month—more than a month." That answer strongly corroborated McConnell. But she immediately

contradicted herself and her testimony is in part as follows: "A I didn't discuss the signing of the mortgage, because I didn't know the instrument that was going to be presented to me until Mr. McConnell presented it to me to be signed that day. (Namely June 27, 1941). Q Had he talked to you about the mortgage? A No, there hadn't been a mortgage mentioned. Q He hadn't asked you to sign a mortgage? A No. Q Up to the day you actually signed it? A Up to the day I actually signed it." The original deed is in the record before us. It shows that it originally named Alvy Dixon as the sole grantee and that Mrs. Dixon's name was inserted therein subsequent to the original drawing of that deed. It was made pursuant to the negotiations which had been carried on in behalf of Alvy Dixon by his son, Lloyd E. Dixon, as we shall hereafter mention in greater detail. Alvy Dixon's own letter in evidence in this case shows that the deed was to be made to him and to him alone. He had been seriously sick in the hospital for more than two and a half months before the deed was delivered. There is no indication in the record that he ever saw the deed before its actual delivery. The testimony in the record shows the contrary. It seems improbable in the face of the negotiations above mentioned, of which Alvy Dixon had knowledge and the fact that he never saw the deed, he would tell Mrs. Dixon that it was to be made to "you and I." On June 28, 1941, the day after she, according to her testimony, signed the mortgage M. E. Corthell wrote to his clients in Pennsylvania as follows: "Mr. McConnell informed me this morning that he has secured Alvy Dixon's signature and acknowledgement to the mortgage deed and notes, but that he has been unable to get Mrs. Dixon to execute the mortgage. * * * Mr. McConnell said that he would make one more attempt to have her sign and acknowledge the mortgage, and in the event she refuses, I suggested that he try to get her to make an

affidavit that she claimed the (her then) residence as her homestead." On July 7, 1941 M. E. Corthell wrote another letter to his clients in the east stating in part as follows: "In order to obtain Mrs. Rosemary Dixon's signature to the mortgage deed back from Alvy Dixon on purchase of the Murray Ranch, Mr. McConnell had to tell her that he would have her named as grantee with Alvy Dixon in the warranty deed. I do not see any objection to her being named as grantee, as long as she executes the mortgage deed which contains a provision releasing the homestead right. She has not signed the notes, and refuses absolutely to do so. * * * Will you please advise me by wire if it is agreeable to have her name inserted as grantee with Alvy Dixon in the Warranty deed, and to accept the notes and mortgage executed as above stated." On July 9, 1941 M. E. Corthell received a wire back substantially authorizing that the name of Rosemary Dixon might be inserted in the deed. That was done and she then signed the mortgage. M. E. Corthell represented the mortgagee. He would not have gone through the idle ceremony of writing the foregoing letters, if the mortgage had been complete on June 27, 1941, as claimed by Mrs. Dixon. No reason is assigned why McConnell should have kept it out of Corthell's hands after it was completed. He testified, as heretofore stated, that he was being pressed to get the transaction completed. Corthell testified: "I knew Alvy Dixon. I learned that he was seriously ill—so serious that it was a matter of concern to immediately close the deal, lest he might not survive."

Counsel for appellants argue that courts hesitate to upset deeds as executed, and require the clearest and most convincing evidence before doing so, citing Bogert, Trusts and Trustees, Vol. 2, Section 464. We think that the trial court was justified in finding that the rule mentioned was fully satisfied in this case.

## 2. ESTOPPEL BY SIGNING MORTGAGE.

Counsel for the appellants argue that Mrs. Dixon acted to her detriment by giving up a valuable right, namely by waiving her homestead right in the premises in question, and in reliance on her being named in the deed as one of the grantees therein; further, that without her consent the purchase could not have been completed. It was further argued at the oral argument in this court that when she signed the mortgage she agreed in the mortgage to pay the taxes thereon and so acted to her prejudice. Counsel think that these facts created an estoppel to question the validity of the deed herein. This matter is mentioned time and again. It is one of the main props upon which the contention for the right of reversal of the judgment herein is based. Counsel for respondents argue that since Mrs. Dixon did not plead an estoppel, which she did not do, no reliance may be had thereon. However, testimony on this matter was introduced without objection, so we shall disregard that point and shall not decide it. There are several answers to the contentions of appellants herein. Article 19, Section 9 of our Constitution provides, speaking of a homestead right, that: "no property shall be exempt from sale for taxes, or for the payment of obligations contracted for the purchase of said premises." In Powers vs. Pense, 20 Wyo. 327, 123 P. 925 it was held that a purchase money mortgage takes precedence of any homestead right. Hence, the mortgage in the case at bar was perfectly good and valid even though she had not waived her homestead right. She had none to waive against the purchase price of the land. By waiving it, she cannot have acted to her detriment. Furthermore, the Murray Ranch was not the homestead of Mrs. Dixon and her husband, and never became such. Hence, what we said in the case of Harney, Admr. vs. Montgomery, 29 Wyo. 362, 373, 213

P. 378 is applicable, namely that "it must be quite clear that unless such homestead right is in existence at the time of the execution of such instrument, no mention would need to be made of such fact. A non-existent right need not be released." Again, if there was any estoppel in this case it would, it seems, be called an estoppel by conduct that "arises where a person, against whom it is pleaded, by his conduct induces another person relying on such conduct to believe in the existence of a particular state of facts and to act thereon to his prejudice." 31 C. J. S. 240. Alvy Dixon himself was not guilty of any such conduct. Aside from the testimony of Rosemary Dixon which was discredited by the court, there is no evidence that Alvy Dixon knew that his wife ever signed the mortgage, let alone that she signed it in reliance on her name being placed in the deed. Whatever was done in that connection was done by an unauthorized act of an agent induced to some extent at least by Mrs. Dixon, herself. What Mrs. Dixon did was to affix a condition to the execution by her of the mortgage. But that was a one-sided action so far as Alvy Dixon was concerned, and was in no way binding upon him. McConnell had no power to accept it and act upon it, as will more clearly appear hereafter. The authority or agreement to affix such condition was lacking just as much as the authority to insert Mrs. Dixon's name in the deed. The authority to do the latter was dependent upon, and in fact interchangeable with, the authority of the former. We know of no law that such unauthorized affixation of a condition by one person can create an estoppel as against the person whose agreement or authority—original or by way of ratification— to affix such condition is required and is lacking. The trial court had the right to find that Mrs. Dixon's name was inserted in the deed without the consent of Alvy Dixon and in fact with her knowledge, and, hence, unlawfully. It would be strange, that she could make such

unlawful act lawful by signing the mortgage in question because of an unauthorized affixation of a condition. If she wanted to make herself liable for the payment of taxes by signing the mortgage she did so at her own risk. Again it does not appear that she ever paid any taxes, and to hold that by the mere undertaking to make such payment she could acquire property worth $27,000, or perhaps $50,000 at the present time, would be carrying the principle of estoppel to an extreme to which we are unwilling to go. True, the testimony shows that the transaction would probably not have been completed if she had not signed the mortgage. If it had not been, the estate of the deceased would have had the cash. She would have had her one-fourth interest. If the cash had been dissipated in whole or in part she would have been the loser to that extent. If, on the other hand, the value of the land has increased, then her one-fourth interest is increased to that extent and instead of a detriment, she was benefited. In view of the fact—as everyone knows—that values or at least prices, of substantially every piece of property in the United States have vastly increased since 1941—we can hardly escape the conclusion that Mrs. Dixon, instead of sustaining a detriment, made, in view of her legal interest in the estate of Alvy Dixon, a substantial gain by finally consenting to sign the mortgage. Hence, looking at the matter from any aspect we wish, it is impossible to see how she has any right of complaint by reason of the foregoing matters.

## 3. PROPERTY HELD IN TRUST.

In view of the immediately preceding discussion, this seems to be the appropriate place to consider the argument of counsel for appellants that plaintiffs and respondents have not pleaded or proved either a resulting trust or a constructive trust. That is substantially a contention that Mrs. Dixon holds the property in ques-

tion legally. As far as pleading is concerned, the plaintiffs sufficiently pleaded the ultimate facts giving rise to a trust. In view of what has already been heretofore stated, we need not indulge in too lengthy a dissertation on the subject of evidence in this connection. If a person does not hold the title to property rightly as against a person lawfully entitled thereto, then according to the terminology usually employed, he holds it (not considering an express trust) either under a resulting trust or a constructive trust. Situations may arise in which a trust may be called either a resulting or a constructive trust. 3 Scott on Trusts, page 2243. There is an element present in the trust involved in this case which is present in one type of resulting trusts, namely the type where a purchase has been made and the legal estate is transferred to one party, but the purchase price is paid by another party. See 65 C. J. 363, Section 139. Counsel for appellants say that while at first glance the situation here presents a case of a resulting trust, the distinguishing feature here is that "Rosemary Dixon in this case gave up a valuable right by signing the mortgage deed and releasing her homestead rights therein, in return for which her name was placed upon the deed; in this case part of the consideration came from Rosemary Dixon." We have already shown that Mrs. Dixon gave up no valuable right and we need not consider that point any further. Counsel further cite us to Sections 441(e), 442 and 458(c) of the Restatement of Trusts, referring to the purchase in the name of a relative or a joint purchase, and holding substantially that in such case no resulting trust arises in the absence of a manifestation of an intention to the contrary, but that a gift is presumed. We have no fault to find with these holdings. But they do not apply in this case. They are based on the assumption, as clearly indicated in Section 458(c), that the conveyance of the property in the manner indicated was made by the

consent, permission or direction of the purchaser of the property. In the case at bar there was, at least in the judgment of the trial court, no such consent, permission or direction on the part of Alvy Dixon, the actual purchaser of the property involved herein.

It is said that a resulting trust arises in favor of the person who transferred the property or caused it to be transferred under circumstances raising an inference that he intended to transfer to the other a bare legal title and not to give him the beneficial interest. 3 Scott on Trusts 2165, Section 404.2; 2 Restatement of the Law of Trusts 1244-1245, 1249, 1341; Millard vs. Green, 94 Conn. 597, 110 Atl. 177; 9 A. L. R. 1610, 1614. It implies the consent of the party furnishing the money to buy property that title be taken in the name of another. That consent is absent in the case at bar, and it would seem accordingly that the trust herein does not fall within the definition of a resulting trust as generally understood by the authorities. Thus it is said in 2 Restatement of the Law of Trusts supra, page 1341 that: "where a person's money with his consent is used by another in purchasing property, but he does not consent that the title to the property shall be taken in the name of the other" constitutes a constructive trust. So it would seem that in view of the predominant factors herein the trust herein is properly called a constructive trust. In 2 Restatement of the Law of Trusts, page 1249 it is stated: "A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property." In 54 Am. Juris. "Trusts," 167 Section 218 it is stated: "A constructive trust, or, as it frequently is called, a trust ex maleficio, ex delicto, a trust de son tort, or an involuntary or implied trust is a trust by operation of law which arises contrary to

intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice." And in Section 219, page 169 of the same work it is stated: "A constructive trust is substantially an appropriate remedy against unjust enrichment. It is raised by equity in respect of property which has been acquired by fraud, or where, although acquired originally without fraud, it is against equity that it should be retained by the person holding it." Pomeroy, Equity, Jurisprudence, Volume 1, Section 155, page 210 states: "Constructive trusts are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation. * * * If one party obtains the legal title to property, * * * in any * * * unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner * * *." In 3 Scott on Trusts 2317, Section 462.2, the author states: "A constructive trust, as I have said, is imposed in order to prevent unjust enrichment. This unjust enrichment may arise out of the wrongful acquisition of the title to property * * *. A constructive trust may arise, however, even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." So it is said that to establish such a trust it is not necessary to show inten-

tional fraud. Tate vs. Emery, 139 Ore. 214, 9 P. 2d 136. See also Teuscher vs. Gragg, 136 Okl. 129, 276 P. 753, 66 A. L. R. 143, Ryan vs. Plath, 18 Wash. 2d 839, 140 P. 2d 968. See Cook vs. Elmore, 27 Wyo. 163, 169, 192 P. 824. When, as in this case, the name of a wife as grantee is inserted in a deed wrongfully and unlawfully by the agent of the husband purchaser on insistence by the wife, without the consent and contrary to the intention of the husband who was the purchaser of the property and paid the purchase price, then we think it to be clear that the person whose name is so inserted holds the property as a constructive trustee. To hold otherwise would be to hold that Mrs. Dixon could profit by an unlawful and wrongful act and that she could legally be unjustly enriched. That plainly cannot be the law. In the case of Allen vs. Allen, 198 Ga. 269, 31 S. E. 2d 483, 489 it is held that whenever the husband acquires the separate property of his wife, with or without her consent, he must be deemed to hold it in trust for her benefit, in the absence of any direct evidence that she intended to make a gift of it to him. The same rule must apply when a wife acquires the separate property of her husband, at least when she acquires it in the manner as is shown in the case at bar.

Counsel for appellants, in a burst of eloquence or indignation, vehemently argue that there is no fraud in wanting one's name to be put in a deed; that Mrs. Dixon was not a deceiver but was deceived; that she acted honorably and within her rights. We should perhaps let that go without comment. However, we might say in passing that we agree with counsel that she had no intention to deceive or defraud; that she did not mean to act dishonorably. But the fact remains, as found by the trial court, that her name was inserted in the deed wrongfully and without the consent of Alvy Dixon. In fact, she knew that to be the fact or should have known

it. That makes it unconscionable and unjust for her to have any part of the title under the deed in question, since she was unjustly enriched, unless we should be willing to hold—as we are not—that wives may deprive their husbands of property by unlawful means. Much can be overlooked when wives seek to protect themselves, but conduct of wives such as here involved cannot be overlooked even though no evil was intended. The statutes of this state protect them fairly well. It is possible that had Mrs. Dixon known the contents of the will of Alvy Dixon, she would not have insisted on her name being inserted in the deed in question, but that, of course, is conjecture.

### 4. AUTHORITY OF AGENT.

It is the contention of counsel for appellants that the devisees of Alvy Dixon are bound by the action of G. R. McConnell because of ostensible or apparent authority which McConnell had in inserting the name of Rosemary Dixon in the deed. They cite a number of cases. We do not find that any of them are in point. It would be useless to attempt to review them. We do not think it is necessary herein to critically examine the cases on agency which are very numerous and sometimes confusing. It is said that an agent's authority is either express, implied or ostensible. There was no express authority for McConnell's action in inserting the name of Rosemary Dixon in the deed in question. So the authority must be either implied or ostensible. It is stated in 2 C. J. S. 1205, Section 96: "Apparent or ostensible authority is such power as a principal holds his agent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence; it is at times confused with implied authority, although distinguishable on the basis that the latter rests on actual authority, the former on estoppel." In 2 C. J. S. 1211 it is stated: "The doctrine of apparent

authority rests upon principles of estoppel, or in the nature of an estoppel, forbidding one to deny to the prejudice of those he has misled the consequences of an appearance of power which he produced." In 2 C. J. 573 (see also 3 C. J. S. Sect. 23 142 and pocket part in which there is a misprint of "nor" for "or") it is said as follows: "For the acts of the agent within the scope of the authority which he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such case would be to enable him to commit a fraud upon innocent persons." There is no evidence in this case that Alvy Dixon ever held out McConnell as having the authority in question here or that he ever knowingly permitted him to assume it. And as we have heretofore shown, Mrs. Dixon has not been defrauded, at least in a legal sense. She paid nothing for the deed; she lost nothing; she parted with nothing substantial. So she could not have changed her position to her detriment. The real question here is whether or not she should be enriched by permitting the deed to stand, to the detriment of the children of Alvy Dixon.

Nor do we believe that McConnell had implied authority to do what he did by reason of being the advisor, or legal advisor, of Alvy Dixon for a great many years. There is a vast distinction between an attorney advising a client to do certain things and doing them himself. It is stated in 2 C. J. S. 1229, in speaking of implied authority of an agent, as follows: "The powers incident to that expressly conferred do not extend in any instance beyond what is usual or necessary as ordinary administrative powers appurtenant thereto. * * * and an act which is adverse to the interests of the principal and not contemplated to benefit him, being obviously not such as is necessary or usual in the

proper accomplishment of the objects of the agency, is clearly outside the authority." And it has been held that implied authority of an attorney does not extend to depriving his client of any substantial rights, but that the authority to do so must be special. Falkenstein vs. Gibson, 108 N. J. Eq. 251, 154 Atl. 876, 76 A. L. R. 1457 and annotation thereto; Dickerson vs. Hodges, 43 N. J. Eq. 45, 10 Atl. 111; Hallow vs. Hallow, 200 App. Div. 642, 193 N. Y. S. 460. No special authority has been shown herein. So it is said that to authorize a conveyance of real estate—a situation close to that in the case at bar—a power of attorney must be plain in its terms. It does not include the power to make a gift. 21 R. C. L. 884, 886, Sections 57 and 58; 2 Am. Juris. 116, Section 145; Baldwin vs. Loesel, 333 Pa. 26, 3 Atl. 2d 389. To change the grantee in a deed is not usual; for an agent to take away one-half or more of the property from an intended grantee, and give it to another, is neither a usual or an ordinary act. So we are unable to see how the rule of implied authority applies in this case.

Howsoever that may be, the arguments of counsel for the appellants are made on the assumption that McConnell was instructed to procure the title to the land in the name of Alvy Dixon and that this was a secret instruction. The assumption is wrong. Mr. McConnell did not negotiate the sale of the land to Alvy Dixon. Some of his own testimony would seem to indicate that he did but as rightly understood must be confined to the matters actually entrusted to him, namely the examination of the abstract of title and to see that all the papers were in proper shape and the negotiations already concluded brought to ultimate fulfilment. The purchase of the property by Alvy Dixon was actually negotiated for him by his son Lloyd E. Dixon. The Keystone Cattle Company in addition to owning the Murray Ranch also

owned the so-called Judson tract of land and wanted to sell both tracts together. The negotiations for both of these tracts were carried on by one John B. Carter on behalf of the cattle company and by Lloyd E. Dixon for himself and his father.

On December 7, 1940 Carter wrote to Lloyd E. Dixon in part as follows: "Of course we are expecting you to take the Judson at $20,000. Please let me know right away what your father thinks about $27,000 for the Murray." On December 12, 1940 Lloyd E. Dixon wrote to John B. Carter in part as follows: "I talked the proposition over with father and we agree to buy, if you will take these payments. We would like the Murray for Alvy Dixon at $27,000. The Judson to Lloyd E. Dixon and Susan M. Dixon, $20,000." On December 16, 1940 John B. Carter answered in part as follows: "Your letter of the 12th instant relating to the purchase of the Murray tract by Alvy Dixon at $27,000 and the purchase of the Judson tract by yourself and wife at $20,000 is received. Your letter has been shown to some of the other owners of this property and the terms and price for the Murray tract is alright. The price for the Judson tract of $20,000 is satisfactory. If the above terms for the purchase are satisfactory, please let me know at once, and oblige." On January 7, 1941 John B. Carter wrote in part: "Your letter of December 26, 1940 concerning the purchase of the Judson and Murray tracts of land in your state, owned by the Keystone Cattle Company of this place is received. You state that you accept our proposition for the purchase of the Judson tract at $20,000. You further state that you accept our proposition for the sale of the Murray tract to your father, Alvy Dixon, at $27,000. Upon the receipt of this letter, I wish you would write me, agreeing to the propositions above stated, so that we may carry the same into execution." On January 19, 1941 Lloyd E. Dixon

wrote to Carter in part as follows: "With reference to your letter dated January 7, 1941 we will agree to your proposition as you have it set forth, that is, 'You state that you accept our proposition for the purchase of the Judson tract at $20,000. You further state that you accept our proposition for the sale of the Murray tract to your father, Alvy Dixon, at $27,000 payments to be one-half in cash and the balance in four equal annual payments with 5% interest.' You can send the abstracts to McCullough and Corthell, at Laramie, with instructions that when they are brought down to date, they will be sent to Mr. McConnell." Pursuant to these negotiations the Keystone Cattle Company made and executed a warranty deed with Alvy Dixon as the grantee to the Murray tract on April 29, 1941 acknowledged partly on April 29, 1941 and partly on May 2, 1941. It is thus seen that the negotiations carried on by Lloyd E. Dixon resulted in a complete and detailed contract, including the fact that Alvy Dixon was the purchaser of the Murray Ranch. All that was done thereafter was merely to carry it to fulfilment. Counsel for appellants say that these letters above mentioned are merely hearsay. We think not. Lloyd E. Dixon's testimony is to the effect that he was his father's agent in negotiating the sale, for he testified that the correspondence above mentioned was "the correspondence in regard to a transaction my father and I had with the Keystone Cattle Company in relation to buying the Murray Ranch and the Judson Ranch." The relationship of father and son makes the supposition that Alvy Dixon knew of the foregoing negotiations not unreasonable. He himself had commenced them at his home at Arlington with the owners of the property in the fall of 1940. He and Lloyd E. Dixon went to the office of McConnell in December, 1940 and discussed the purchase of the property involved herein in his name. Mrs. Dixon testified that her husband, in the spring of 1941, was alarmed at being

sued for not completing the contract. This could only mean that he knew of the completed contract negotiated by Lloyd E. Dixon on his behalf. And that would seem to preclude any inference that ostensible or implied authority was given to some one else, namely to McConnell, to change what Lloyd E. Dixon had done. If anyone whatever had the authority to insert the name of Rosemary Dixon in the deed, it would have been Lloyd E. Dixon, and not G. R. McConnell. The latter was the attorney for Alvy Dixon. He had been for many years. But to attend to legal matters, and change the grantees in a deed are two different matters. He testified that: "I had no general instructions to go ahead without request from him (Alvy Dixon), but I took care of whatever business that he came to see me about." At the time of the foregoing negotiations, Alvy Dixon was 78 years of age. If the change in the deed in question herein had been legally made so as to make the grantees tenants in the entirety, it would have been at best but a few years that Rosemary Dixon or her children, would have become the sole owners of the property, to the exclusion of the children of Alvy Dixon. It would seem to be but good common sense that authority to make the change made in the case at bar should be rather explicit, and not be gathered from the mere fact that the person who made it was the legal advisor of the original grantee in the deed, or for that matter, the legal advisor of all the members of the family.

Complaint is made that McConnell did not inform Mrs. Dixon that he had no right to insert her name in the deed. No authority is cited that it was his duty to do so. Besides, McConnell testified that, while he did not in so many words tell her that he had no power to insert her name, he virtually did so. He stated: "She knew what the instructions were and she knew the deed

came through in Dixon's name pursuant to the contract." The burden to show the extent of the authority of McConnell was on Mrs. Dixon. 3 C. J. S. 257. Furthermore, considering the matter from the pure standpoint of justness she has no right to complain. As we have heretofore shown she lost no legal rights; she parted with nothing substantial. The court, in holding that her name was inserted wrongfully, merely prevented her from obtaining an unjust enrichment.

## 5. RATIFICATION.

It is claimed by appellants that Alvy Dixon ratified the unauthorized acts of McConnell in inserting the name of Mrs. Dixon in the deed. We have carefully read over what counsel for appellants say on the subject and have done so several times and we have been unable to reach the conclusion at which they have arrived. We see no reason to disagree with the authorities cited by counsel but do not believe that they show that we must overturn the judgment and the finding of the trial court in this connection. Counsel for appellants admit at least this much, namely, that "in the instant case * * * there is no evidence in the record to show whether Alvy Dixon ever approved of the transaction or not." This would almost seem to be an admission that their clients have not sustained the burden of proof resting upon them. But we shall disregard that. It may be well before proceeding further to state some general rules. It is said in 3 C. J. S. 267: "A party alleging, asserting, or relying on a ratification of the unauthorized act of an agent has the burden of proving it. To sustain the burden of proof, the party on whom it rests must show that the ratification was made under such circumstances as to be binding on the principal; he must show that the principal intended to ratify," etc. Again it is a general rule that a principal in order that his acts may be held to constitute ratification must have full knowledge at the

time of the ratification of all material facts and circumstances relating to the unauthorized act or transaction. 2 C. J. S. 1081, 2 Am. Juris. 179, Section 224, 2 Am. Juris. 190, Section 236. Thus it is said in 2 C. J. S. 1121 and 1122: "In order that the conduct of a principal may be deemed to have impliedly ratified an unauthorized sale or transfer of property on his behalf, it is essential that he have full knowledge of the facts surrounding the unauthorized act." In this case the insertion of the name of Mrs. Dixon is substantially an attempt to transfer property from Alvy Dixon to his wife. Ordinarily, it is said, the knowledge required must be actual. Thus it is said in 1 Mechem on Agency (2d Ed.) 294, Section 403 as follows: "It must be kept in mind also that, where the law thus requires knowledge, it is ordinarily actual knowledge, and not merely the opportunity for acquiring knowledge, which is demanded. As stated in one case, 'knowledge—not the existence of circumstances which would, by the exercise of due care result in knowledge—is essential to the ratification of an act.' The principal, where nothing has occurred to put him on his guard, is not bound to distrust his agent; he has the right to assume that the agent will not exceed his authority; * * * and he is not obliged, before accepting the benefits of an unauthorized act, to inquire whether, in performing it, the agent has not in some way violated his trust. Mere careless ignorance, or mere negligence in not discovering the departure from authority, where there is nothing to suggest it, is not enough. Neither is the principal to be charged with mere constructive notice. He is not, for example, obliged to search the public records for evidences of his agent's defaults, and he is not charged because such records would disclose that the agent was performing unauthorized acts." Furthermore, acquiescence without knowledge of the material facts is not sufficient. In 2 C. J. S. 1128 we find it stated: "Since as noted in Section 42 of this Title full

knowledge, on the part of the principal, of the facts surrounding an unauthorized act is essential to valid ratification thereof, the principal must have full knowledge of the unauthorized act of his agent and an opportunity to repudiate the same before any delay in repudiating the act in question can constitute a ratification thereof." Mechem on Agency, supra, Section 453 states: "There is a popular notion,—finding expression in a familiar adage,—that silence gives consent. This, however, is true in law only to a very limited extent. No legal liability can result from silence alone, unless one owes a duty to speak." The same author in Section 455 cites some cases from Texas in which it was said: " 'Silence simply in itself is no evidence of anything; but the conditions under which it occurs, and accompanying it, may show it to be a ratification. We commend the expression of Mr. Justice Collard in Meyer vs. Smith (3 Tex. Civ. App. 37) : "Mere delay in repudiating will not, in our opinion, have the effect of ratifying. It would be evidence, along with other facts, from which if it should be unreasonable, the jury might infer that there was a ratification." ' " In 2 C. J. 510 it is said that: "as a general rule mere silence or delay will not be conclusive of ratification unless the rights of innocent third persons have been prejudiced thereby." See also 2 C. J. S. 1127. In fact, a number, if not most of the authorities (although not all), hold that the rule of ratification by silence rests upon the doctrine of estoppel; that is to say that a person dealing with the agent must be injured or damaged. Thus it is said in Smith vs. Fletcher, 75 Minn. 189, 77 N. W. 800 as follows: "Implied ratification, by mere silence or failure to expressly disaffirm, has its foundation in the doctrine of equitable estoppel, and proceeds upon the maxim of the law that he who remains silent when in conscience he ought to speak will be debarred from speaking when in conscience he ought to remain silent. Where the rights and

obligations of third parties may depend on his election
to ratify or disaffirm, a party is bound to act, or suffer
the consequences of inaction; and if, after knowledge,
he remains entirely silent and impassive, it is but just,
when the protection of third parties requires it, to pre-
sume that what, upon knowledge, he has failed to re-
pudiate, he has tacitly ratified. Mechem, Ag., §§ 155-
157. To render the evidence conclusive of implied rati-
fication by silence or mere nonaction, the facts must be
such that the law will presume that third parties would
be prejudiced by the delay in speaking or acting, if the
party should be thereafter permitted to say that he had
not authorized or ratified the act of his assumed agent.
This principle has not always been distinctly or ex-
pressly announced by the courts, but we think that it
will be found that, in almost every well-considered case
in which it has been held that there was an implied rati-
fication by silent and merely passive acquiescence, the
facts brought the case within the rule substantially as
we have stated it."

Counsel for appellants, while not disputing the gen-
eral rules above stated, claim that Alvy Dixon should
have known, under the circumstances, that Mrs. Dixon's
name was inserted in the deed and was bound thereby
when he did not repudiate it. They cite, for instance,
Section 404 of Mechem, supra, dealing (as stated in the
caption) with "Wilful Ignorance," and where it is
stated: "At the same time, however, the principal can-
not be justified in wilfully closing his eyes to knowledge.
He cannot remain ignorant where he can do so only
through intentional obtuseness. He cannot refuse to
follow leads, where his failure to do so can only be ex-
plained upon the theory that he preferred not to know
what an investigation would have disclosed. He can-
not shut his eyes where he knows that irregularities
have occurred. In such a case, he will either be charged

with knowledge, or with a voluntary ratification with all the knowledge which he cared to have." And on the same subject counsel cite our case of Farmer's State Bank vs. Haun, 30 Wyo. 322, 222 P. 45, Clews vs. Jamieson, 182 U. S. 461, 45 L. Ed. 1183, 21 Sup. Ct. 845, Mc-Ginley vs. Maryland Casualty Co., 85 Mont. 1, 277 P. 414, Chicago & E. I. R. Co. vs. Wright, 153 Ill. 307, 38 N. E. 1062. And they further rely upon the fact that Alvy Dixon reaped the benefit of his transaction after having knowledge of the facts, citing in that connection the case of Andrews vs. Robertson, 111 Wis. 334, 87 N. W. 190. See also 2 Am. Juris. 181, Section 227, 2 C. J. S. 1097, Section 49.

Let us examine the facts in this case in the light of these authorities. It is hardly necesary to refer to the acceptance of any benefits on the part of Alvy Dixon, assuming that there was such. Aside from the testimony of Mrs. Dixon which the court disregarded—there is not the slightest evidence in the case that Alvy Dixon ever knew that the mortgage was signed by Mrs. Dixon, let alone that it was signed under the condition laid down by Mrs. Dixon. It was apparently discharged and released in the fall of 1941. He cannot, accordingly, under the rules above stated, be said to have ratified an act of which he had no knowledge. Furthermore, we have already fully heretofore shown that Mrs. Dixon inserted in the deed. The witness McConnell testified was not in any way damaged by her signing the mortgage and that the real question herein is as to whether she should be enriched at the expense of the children of Alvy Dixon.

Aside from the testimony of Mrs. Curzon and Bryan White which the court disregarded, there is not the slightest evidence in the case that Alvy Dixon had knowledge of the fact that Mrs. Dixon's name had been that after the deed was filed of record it was returned

to his office; that he kept it there and it was never shown to Alvy Dixon and he never saw it. There is no evidence in the case that anyone ever told Alvy Dixon of the insertion of his wife's name in the deed. Not even Mrs. Dixon testified to that effect. Whether that was by reason of fear that the knowledge of that fact might kill Alvy Dixon or that he might bring an action to cancel the deed, or whether there was some other reason is, of course, conjecture inasmuch as the record does not shed light on that point. The testimony of Bryan White and Mrs. Curzon is merely to the effect that he spoke as though he knew that Mrs. Dixon's name was in the deed. We cannot say the action of the court was wrong in disregarding the testimony. The negotiations were to the effect that Alvy Dixon should have title to the land. In the absence of direct communication to him to the contrary, and since he never saw the deed, the testimony that he spoke of the deed as being in the name of both himself and his wife's does not sound reasonable.

We find, however, an ingenious argument by counsel for the appellants. They say that since McConnell knew of the insertion of Mrs. Dixon's name in the deed in question and since in recording the deed he was Alvy Dixon's agent, the knowledge of McConnell was imputable to Alvy Dixon. In other words he had notice of the deed through his agent and he ratified it by not promptly repudiating it. Counsel, however, have neglected to cite us to any authority for what appears to be a somewhat startling conclusion. We think that the argument contains a fallacy. It is based on the wrong assumption. McConnell had authority to record a deed in which Alvy Dixon was the grantee, and the sole grantee. He had no authority to record a deed in which Mrs. Dixon was the grantee, in whole or in part. The recording of the deed (it was in fact placed of record

by M. E. Corthell) insofar as it contained Mrs. Dixon's name may be said to have been merely the completion of the unauthorized act of inserting her name in the deed, and must fall with the principal act. Mechem on Agency, supra, dealing with this point in Section 407 states: "But the knowledge of the particular alleged agent himself of his own unauthorized act cannot thus be imputed to the principal, in such manner as to satisfy the requirement of knowledge by the principal; for, as to the matter in question, the person acting is not agent until ratification, and it cannot be said that the principal has ratified with knowledge at the time of ratification, simply because the person who thus becomes agent had knowledge." The argument of counsel is somewhat in line with another argument made by them, namely that Alvy Dixon had constructive notice by reason of the fact that the deed was recorded. That argument is met by Mechem supra, Section 403 already quoted above wherein the author holds that no one is obliged to search the public records for evidence of his agent's faults. The text is supported by later authorities, namely Ackerson vs. Elliott, 97 Wash. 31, 41, 165 P. 899, Ryan vs. Plath, 18 Wash. 2d 839, 140 P. 2d 968, 980, Armstrong vs. Ashley, 204 U. S. 272, 51 L. Ed. 482, 27 Sup. Ct. 270, 45 Am. Juris. 470, Section 89. The argument above mentioned is also in line with the further contention that it was the duty of Alvy Dixon to inquire of his attorney how the title to the land stood. This also is answered by Mechem supra, Section 403 already quoted.

That leaves only the argument of counsel for appellants that Alvy Dixon should, under the circumstances of this case, have known that the name of Mrs. Dixon had been inserted in the deed. It comes down substantially to what Mechem on Agency above mentioned refers to as wilful ignorance. The only matter—aside

from those already mentioned—referred to by counsel —is that Alvy Dixon and his wife entered into a lease with Bryan White on or about February 15, 1943 whereby the land was leased to White. And it is argued that by reason of that lease Alvy Dixon should have known that the deed stood in the name of himself as well as his wife's. We think, however, that this in and of itself is hardly sufficient to charge Alvy Dixon with wilful ignorance or gross negligence. Here, too, counsel have neglected to cite us to any authority for the support of their contention. It is not, we think, unusual for huband and wife both to sign a lease to premises. It is not, of course, surprising that White asked for a lease which was to be signed by both Alvy Dixon and his wife, inasmuch as the record showed the deed to be in the names of both. Possibly a normal man, when confronted with the lease, might have wondered why his wife should join in a lease, when the title was in his own name, and might have said that it would not be necessary for the wife to sign it. But Alvy Dixon, 78 and more years old, was not a normal man physically, or a normal and alert man mentally. And it can hardly be that a court of equity, in determining whether or not ratification took place and whether or not Alvy Dixon was wilfully ignorant of his rights or grossly negligent in not ascertaining the facts confronting him, did not have the right to take the physical and mental condition of Alvy Dixon into consideration. Counsel for appellants wholly ignore this phase of the case and seem to consider that Alvy Dixon's action must be judged by that of a normal man physically, and normal and alert mentally. But we are here dealing with conduct. We have not found any cases directly in point but we find an analagous rule stated in 65 C. J. S. 399 where it is stated: "The amount or degree of vigilance and caution which is necessary to reach the required standard of reasonable or ordinary care may vary according to the

capacity of the person with respect to whom the duty to exercise care exists, and, hence, in determining whether or not an act or omission resulting in injury to another involved a lack of sufficient care, the ability of the person injured to take care of his personal safety is a matter proper for consideration." Alvy Dixon was seriously ill in the hospital from April to July, 1941, a period of nearly three months, due to a heart attack or what is called a "stroke." Lloyd E. Dixon testified that Alvy Dixon never was normal after the first attack. "We noticed that even when he was away from the ranch there were senses he didn't have. He didn't have direction, he couldn't tell you what time of day it was. He would get up in the middle of the night with his clothes on, and if he was to walk out his own door, where he lived, he couldn't tell you what direction he was going, if you would ask him, and he didn't know the day of the week or he couldn't tell you the day of the month, and those senses seemed to be gone, and he never was normal after this first attack." Apparently Alvy Dixon had a second "stroke" thereafter. He stayed at his home from July to October, 1941. Then he was taken to Phoenix, Arizona, for a little while, and from then on he was in the care of a nurse practically all the time until a short while before his death. On March 1, 1943 Mrs. Dixon and the children of Alvy Dixon asked for an appointment of a guardian for him and his property. On April 17, 1943 the First National Bank of Laramie and Lloyd E. Dixon were appointed guardians of the estate and person of Alvy Dixon. On October 23, 1944 he was by an order of the court duly declared to be insane and he died in the month thereafter.

In addition to that we might refer to the fact that on or about February 17, 1943 Alvy Dixon wrote a letter to his "folks" in which he stated that he had leased the

property to White for a period of two years, when in fact the lease was for five years, with the privilege of renewal for another five years. A short while thereafter he talked with the witness McConnell at which time Alvy Dixon stated to the witness referring to the lease: "yes, I understand that White has stole my Murray Ranch, they told me it was a lease but I find it was a deed, * * * well, I thought it was a lease but they got a deed." Taking all the facts and circumstances into consideration, we do not believe that the court was bound to find that Alvy Dixon had ratified the deed in question here.

## 6. OTHER OBJECTIONS.

Appellants assign as error that the court found the deed from Mrs. Dixon to Bryan White and wife to be invalid. This assignment of error is closely allied to the next one and may be considered together with that. It is objected that the decretal portion of the judgment is erroneous. It is as follows:

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT: That the S½ of Section 4; all of Sections 5 and 9; all of Section 17 except the SE¼SE¼, SE¼NE¼, S½SE¼ and the NE¼SE¼ of Section 18, all in Township 19 North, Range 78 West of the 6th P. M., is part of the assets of the Estate of Alvy Dixon, deceased, and that any title which the Defendants, or any of them, hold to the above described property is held in trust for the Devisees of Alvy Dixon, deceased, subject to the administration of his estate and to the charge thereon of Rosemary Dixon, as his surviving widow, as provided by Section 6-301, Wyoming Compiled Statutes, 1945; that the Defendants, and each of them, within thirty (30) days after the filing of this judgment, shall execute and deliver a quit claim deed, or other sufficient deed, to the Devisees of Alvy Dixon, deceased, to-wit: Lloyd Dixon, Margaret A. LaBeau, Charlotte P. Rosenlieb and Edith A. Brokaw to the above described property, subject to the administration of his estate and the charge thereon of Rose-

mary Dixon as his surviving widow, and in default of the execution and delivery of said deed, as aforesaid, by the Defendants, this Judgment shall have the effect and operation, at law and in equity, of such conveyance so as to vest title to said premises in said Devisees in fee simple, subject to the administration and the charge as aforesaid."

Counsel for appellants argue that the decretal portion above set out usurps the function of the probate court in attempting to distribute the property of the estate of Alvy Dixon which only the probate court can do. The decree may not have been drawn in the best manner possible but the intention of the trial court is clear. We can see no serious objection to the decree, and it would not be worthwhile to attempt to reconstruct it. We do not think that the court attemped to usurp the function of the probate court. The main portion of the decretal portion of the judgment is that the property here in question belongs to the estate of Alvy Dixon, deceased. All other matters in the main merely attempt to enforce that portion of the decree. The court specifically left the administration of the property in the hands of the probate court.

It is objected that the court erred as heretofore stated in finding the deed from Mrs. Dixon to the Whites to be invalid. It is argued that since Mrs. Dixon had some interest in the property, it follows that her deed to the Whites is effective to convey this interest whatever it is. That deed was not put in issue in the case either by the pleadings or in any other way, and the decree herein accordingly does not adjudicate the rights as to the deed between the parties themselves, but only that the property belongs to the estate of Alvy Dixon, deceased. It is further objected that any quit-claim deed executed by the Whites herein would nullify the lease which Bryan White has in the premises here in question. That lease too, was not put in issue in this

case, and, hence, the decree herein would not adjudicate anything in connection therewith. In order, however, to avoid any possible question in connection with the matters herein mentioned, let it be added at the end of the decretal portion of the decree herein as follows: "Provided, however, that nothing herein contained attempts to adjudicate the validity of the lease which Bryan White may have in and to the premises here in question, nor any questions which may arise as to the deed from Rosemary Dixon to Bryan White and wife insofar as they may relate to matters between themselves only."

With this modification the judgment and decree of the trial court herein is affirmed.

*Affirmed.*

KIMBALL, C. J., and RINER,. J, concur.