ETHEL HAWKEY,

*Plaintiff and Appellant,*

vs.

JENNIE WILLIAMS, Executrix of the Estate of Nona Williams, Deceased, and JENNIE WILLIAMS,

*Defendants and Respondents.*

(No. 2585; September 8, 1953; 261 Pac. (2d) 48)

22

For the plaintiff and appellant the cause was submitted upon the brief and also oral argument of Jack Wolfe and Henry A. Burgess, both of Sheridan, Wyoming.

For the defendants and respondents the cause was submitted upon the brief and oral argument of Burt Griggs of Buffalo, Wyoming, and H. Glenn Kinsley of Sheridan, Wyoming.

## OPINION

RINER, Justice:

A direct appeal proceeding from a judgment of the District Court of Sheridan County brings this case here for review. The cause was tried by the court no jury being in attendance. The plaintiff, Ethel Hawkey, and the defendant Jennie Williams are sisters. The other defendant is also Jennie Williams but she was sued in her official capacity as executrix of the estate of Nona

Williams, deceased. Nona Williams was the mother of these two girls, Ethel and Jennie, who are the only surviving children of Allen and Nona Williams. When the evidence introduced on behalf of the plaintiff was concluded, upon a motion made by the defendants immediately thereafter for an order "dismissing plaintiff's petition at plaintiff's cost and for a judgment for the defendants both individually and as executrix of the estate of Nona Williams deceased," the court sustained the motion and entered final judgment as requested by that motion.

The reasons advanced in support of this motion and the terms of judgment entered will be hereinafter set forth. The parties hereto will usually be referred to as designated in the District Court or by their individual names, the plaintiff below being now the appellant and the defendants the respondents here.

The plaintiff's petition summarized is substantially as follows: She alleges that on May 11, 1934, Allen Williams died leaving a will as shown in case No. 2687 of the Probate Files of the District Court aforesaid wherein all the property of said decedent was devised and bequeathed to Nona Williams, his wife, then living, but since deceased and his two daughters, Ethel and Jennie. The terms of that will are then recited verbatim. The "Second" paragraph of that instrument reads, as pleaded (after directing payment in the "First" paragraph thereof of all expenses of last illness, funeral, testamentary expenses and "just debts") ;

"SECOND: All the rest, residue and remainder of my property, whether real or personal and wherever situate, that I may have or own at the time of my death, I hereby give, devise and bequeath to my beloved wife, Nona Williams, and to my beloved daughters, Jennie Williams and Ethel Williams, share and share alike."

This will was witnessed by Annabel Wolfe and H.

Glenn Kinsley, each of these witnesses being stated as residing in Sheridan, Wyoming.

Paragraph "2" of plaintiff's petition sets forth the property of Allen Williams' estate as detailed in the inventory and appraisement in said estate file. Paragraph "3" of plaintiff's petition avers that the ranch properties so described could not be divided into three parts without material injury to the interests of the three beneficiaries above named; that it was the desire of Nona Williams, plaintiff's mother, that said properties should continue operation as one unit so long as she should live. That thereafter about May 28, 1934, Nona Williams and her agents represented and promised the plaintiff that she and her sister Jennie would share equally in all of said ranch properties upon Nona Williams' death if plaintiff would assign her one-third interest therein to her mother Nona for life. That at said time, in reliance upon said representations and promise that the plaintiff and her sister would share equally in said ranch properties and in reliance upon the implied obligation that her mother would make no will inconsistent with her said promise and representation and that she would not otherwise dispose of said property, plaintiff assigned her entire one-third interest in such property to her mother, and plaintiff thereby performed all conditions on her part to be performed under said agreement.

Paragraph "4" of plaintiff's pleading stated that there was no other consideration for the aforesaid assignment of plaintiff's one-third interest in said property to Nona Williams other than said representations that plaintiff and Jennie would share equally in all the aforesaid properties upon Nona's decease.

Paragraph "5" of plaintiff's pleading alleges that plaintiff having become apprehensive that the oral ar-

rangement described in paragraph "3" supra might not be carried out she obtained advice from an attorney who told her that she could have the assignment of her one-third interest set aside if there was any doubt that plaintiff would receive one-half of said ranch properties. That plaintiff was induced not to file suit for the recovery of said properties because she was assured by Nona and her authorized agents that all of said properties would ultimately be divided equally between plaintiff and Jennie and that in effect Nona had so provided in her last will; that in reliance upon these representations plaintiff did forego instituting any proceedings as advised and rested upon these assurances.

Paragraph "6" of said petition avers that Nona died March 19, 1951, leaving a will which bequeathed one dollar ($1.00) to Ethel and all Nona's real and personal estate was devised and bequeathed to Jennie, her sister.

It was alleged in paragraph "7" the inventory and appraisement on file in Nona Williams estate consisted of certain described personal property valued at $27,645.00.

Paragraph "8" states that Jennie was on April 30, 1951, duly appointed executrix of Nona's said will, and ever since and now is such executrix.

Paragraph "9" alleges that prior to her death Nona conveyed the real estate mentioned in paragraph "2" hereof (excepting 649.89 acres located in Johnson County, Wyoming, known as the Eva Williams Place and which was previously conveyed to a bona fide purchaser,) to the defendant Jennie Williams. That the conveyance to Jennie was made without consideration for the purpose of defrauding plaintiff and any title the said Jennie now has in said properties should be decreed to be held in trust for the benefit of this plain-

tiff and subject to the agreement that Ethel and Jennie should share equally in said ranch properties.

Paragraph "10" avers that Nona and Jennie had a joint bank account in which the usual income of the ranch properties aforesaid was deposited from which Jennie received several thousand dollars upon Nona's death and for which the said Jennie should be required to account.

Paragraph "11" alleges that the Allen Williams' ranch properties total value exceeds the sum of $150,-000.00 and that the one-third interest assigned to Nona by this plaintiff as above alleged has a present approximate market value of $50,000.00.

Specific performance of the agreement that Nona had with Ethel that she should have one-half of the Allen Williams' ranch properties was prayed and that defendants be ordered to convey to plaintiff an undivided one-half interest in the said real estate; a one-half interest in the property appraised in Nona Williams' estate and a one-half interest in the joint bank account and that if the defendants refuse to comply with said order the decree should operate as a conveyance as provided in Section 3-3509 W.C.S. 1945.

It was also prayed that in the event that the oral promise of Nona Williams could not validly be enforced the defendants be ordered to restore to plaintiff her one-third interest in the Allen Williams' properties conveyed to Nona as set forth in paragraph "3" hereof or that plaintiff have judgment for $50,000.00.

To plaintiff's pleading as thus substantially set forth, defendants on February 8, 1952, filed their joint answer to the petition reviewed as above, wherein they admitted the allegations of that pleading set out in paragraphs numbering 1, 6, 7 and 8 and admitted also that

Nona Williams and her daughter Jennie maintained a joint bank account at the date of Nona Williams' death. They denied generally and specifically all the other allegations in plaintiff's petition.

As a further defense it was alleged in defendants' answer paragraph "3" thereof that on or about May 28, 1934, the defendant Jennie and plaintiff Ethel for $1.00 consideration and other valuable considerations and considerations of love and affection for their mother conveyed to Nona Williams all their right, title and interest as beneficiaries under the last will of Allen Williams, deceased, in all of the real estate of said Allen Williams. That this conveyance was made by quitclaim deed recorded December 13, 1934, in Sheridan County and June 20, 1945, in Johnson County, Wyoming; that a copy of said deed was attached to said answer as exhibit "A" and made a part of said answer. That this instrument was an absolute conveyance and not one to Nona for life; that it was made without any representations, promises or agreements as to how the grantors would share in the estate of Nona Williams in the event of her decease.

### Paragraph IV (Defendants' Answer.)

That at some date after the deed to Nona had been executed, plaintiff, Ethel, developed a violent and unreasonable dislike of her mother Nona, who had always been a kind mother to her two daughters; that about two years after the execution of said deed plaintiff refused to speak to or recognize her mother, and Ethel and her husband, Walter Hawkey, refused to permit their children to visit Nona Williams, although plaintiff's family resided but a short distance from Nona; that plaintiff though living on an adjoining ranch treated Nona as an absolute stranger without any fault on the part of the latter. That "this defend-

.ant" (Jennie) remained with her mother and assisted her in the operation of the ranch and conduct of her affairs until Nona died.

## Paragraph V (Defendants' Answer.)

. That on July 26, 1941, for the consideration of $1.00 and other valuable consideration and for love and affection for her daughter "this defendant Jennie Williams" (this is an error and should read "Nona Williams") executed and delivered to "this defendant (Jennie) a warranty deed of a portion of the real estate described in plaintiff's petition. That this warranty deed was recorded in Sheridan County, August 21, 1948, and on September 1, 1948, in Johnson County, Wyoming. That said deed as Exhibit "B" is attached hereto and made a part of such answer.

## Paragraph VI (Defendants' Answer.)

That Nona died on March 19, 1951, at Sheridan County, Wyoming, at the City of Sheridan and as a resident of said county; that she left a will dated February 21, 1938, which was admitted to probate in said District Court on April 30, 1951; that said will being exhibit "C" was made a part hereof. That notice to creditors was published on May 1, 8, and 15th, 1951, in the regular issues of a Sheridan newspaper. By said notice, creditors of said estate were required to file their claims within six months after May 1, 1951; that plaintiff filed no contest of Nona's will or creditor's claim and the time to do this has expired. That notice of final settlement of said estate was published on November 2, 9, 16, and 23rd, 1951, fixing the date for filing objections thereto on December 5, 1951; that said final report was filed as limited by said notice and said notice was served on plaintiff as required by law. That the bequest of one dollar ($1.00) made by Nona to the

plaintiff has been tendered to said plaintiff by the executrix, Jennie.

Paragraph VII. (Defendants' Answer).

That Nona left with her will a sealed letter addressed to plaintiff which "this defendant" (Jennie) alleges made explanation of the reasons why she made the bequest she did to plaintiff by her said will; that "this defendant" has never read said letter and does not know the "exact" contents thereof, but alleges that its contents have "a very direct bearing upon the issues in this case" and that "this defendant" by attached interrogatories asks that "plaintiff disclose the contents thereof." Certain interrogatories were attached to said answer and were answered under oath in connection with plaintiff's reply to said answer.

March 1, 1952, plaintiff filed her reply to said answer admitting that plaintiff and Jennie filed a quitclaim deed, exhibit "A" in defendants' answer and admits it was recorded as stated therein; that plaintiff denies all other allegations in paragraph III of defendants' answer, and further replying to paragraph III plaintiff alleges that there was no consideration for such deed other than as alleged in paragraph "3" and "4" of plaintiff's petition; that said conveyance was never intended as an absolute conveyance being executed by plaintiff and Jennie at the same time they assigned their interest in the Allen Williams' estate to their mother, Nona; that when they signed the quitclaim deed the attorney for the executrix of the said estate —who was also acting as attorney for plaintiff and defendant Jennie—represented that said deed would only make it possible for Nona to have the use of the property while living; that plaintiff relied upon said representation when she signed said documents and was not

informed that said quitclaim deed was an absolute conveyance as defendant Jennie contends.

Said reply denies each allegation in paragraph IV of defendants' answer and in paragraph V all averments inconsistent with the allegations of paragraph "9" of plaintiff's petition. The reply denied all matters set out in paragraph VI of said answer except as admitted in plaintiff's petition. The reply further admits as stated in paragraph VII of said answer that plaintiff received a sealed letter from Nona after her death and denies all other matters in said paragraph VII.

In answer to the interrogatories attached to the defendants' answer, plaintiff states that the names and addresses of the agents of Nona Williams mentioned in paragraph "3" of said petition were Jennie Williams, residing at Banner, Wyoming, and H. Glenn Kinsley of Sheridan, Wyoming; that the promise referred to in paragraph "3", of plaintiff's petition was "oral"; that the agents of Nona Williams mentioned in paragraph "5" of plaintiff's petition were "H. Glenn Kinsley, Sheridan, Wyoming"; that said agents were authorized orally to make the representations mentioned in paragraph "5" of plaintiff's petition; that plaintiff filed no creditor's claim either with the executrix or with the Clerk of the District Court in said estate of Nona Williams, deceased.

On the issues thus made the trial of the case was commenced June 3, 1952, in the District Court of Sheridan County as stated above. The motion for an order dismissing plaintiff's petition and for judgment for the defendants assigned as reasons therefor reads as follows:

"First, that plaintiff has wholly failed to offer any sufficient evidence to support the allegations of her Petition or to sustain judgment thereon in favor of the plaintiff and against the defendants.

"Second, that plaintiff has wholly failed to offer any evidence upon which the Court can find that a valid contract was ever made between Nona Williams, Deceased, and plaintiff, as alleged in plaintiff's Petition.

"Third, that there is no evidence before the Court to sustain a judgment for specific performance, as alleged in the Petition.

"Fourth, that no creditor's claim was ever filed by plaintiff or anyone else in her behalf in the matter of the Estate of Nona Williams, Deceased, and the time for filing such claim has expired."

The judgment entered by the court omitting preliminary recitals was:

"And thereupon the Court proceeded to hear the, testimony adduced b ythe Plaintiff and, the Plaintiff having rested her case, the Defendants moved the Court for an order dismissing Plaintiff's petition and for judgment in favor of the Defendant, both individually and as Executrix of the Estate of Nona Williams, deceased:

"And thereupon, the Court having heard the arguments of counsel and being now in all respects fully advised in the premises does find generally in favor of the Defendants upon all of the issues and in particular as follows to-wit:

"1.  That Plaintiff wholly failed to offer any sufficient evidence to support the allegations of her petition or to sustain a judgment thereon in favor of the Plaintiff and against Defendants.

"2.  That Plaintiff has wholly failed to offer any evidence on which the Court could find that a valid contract was ever made between Nona Williams, deceased, and Plaintiff as alleged in Plaintiff's petition.

"3.  That there is no evidence before the Court to sustain a judgment for specific performance as prayed in Plaintiff's petition.

"WHEREFORE, IT IS HEREBY CONSIDERED, ORDERED, ADJUDGED AND DECREED by the Court that Plaintiff's petition be, and the same hereby

is, dismissed and judgment is rendered in favor of the Defendants and against the Plaintiff for the cost of this action taxed at $8.25."

To which judgment plaintiff excepted and exception was allowed.

The first inquiry that logically suggests itself in connection with the disposition of this case is whether the evidence submitted by this record should be viewed by this court on appeal in any especial manner when the trial court has ordered a dismissal and final judgment to be entered in favor of the defendants with only the plaintiff's proofs before it. In answer to this query the following citations are appropos as they indicate not only the course to be pursued in the appellate court but also indicate the duty of the trial court in passing upon a motion for dismissal under such circumstances:

3 Am. Jur. 507, 508, § 945 lays down the rule that:

"In reviewing the action of the trial court in taking a case from the jury on a motion for a nonsuit on the ground of the insufficiency of the plaintiff's evidence, or upon a motion to direct a verdict based upon the ground that the adverse party had not made out his cause of action, or defense, as the case may be, the court on appeal need only notice evidence of the appellant. That court must accept or assume the truth of all the evidence given by the party against whom the nonsuit was ordered or the verdict directed and give him the benefit of all legitimate inferences that may reasonably be drawn therefrom in his favor. The court must assume the truth of appellant's testimony, although it be contradicted, or improbable, if the jury could reasonably have found the fact, or facts, which such evidence tended to prove, and in determining whether the action of the lower court was error, the reviewing court will give this evidence the most favorable construction or consider it evidence in the most favorable aspect to the plaintiff of which it is reasonably susceptible; all just inferences that can be drawn therefrom will be drawn, and it will be given its utmost effect."

In accord with the foregoing the same text, American Jurisprudence, Vol. 53, pp. 257, 258, §§ 313, 314, asserts that:

§ 313. "Construction of Evidence: In passing on the defendant's motion for a nonsuit, the evidence on behalf of the plaintiff must be accepted as true, and all conflicts in testimony must be resolved in his favor; the evidence must be interpreted most favorably to him and most strongly against the defendant. Indeed, the defendant's evidence may not be considered except in so far as it tends to clarify or explain the evidence of the plaintiff"

§ 314. "Inferences: * * * Thus, upon motion for nonsuit of an action on a contract which contained a provision for renewal, because of a notice of cancellation after the renewal date the inference may be drawn that the contract was renewed, so as to justify denial of the motion. No intendments are to be made in favor of the defendant."

and 53 Am. Jur. § 1126, pp. 782, 783, says that:

"In ruling upon a motion for a nonsuit, the rules governing the court are the same whether the action is tried to the court or to a jury. A motion to take a case from the jury on the ground of the insufficiency of the plaintiff's evidence should be denied, where there is evidence which justifies an inference of the facts upon which his right to recover depends. By analogy, the trial judge, sitting without a jury must deny a motion for a nonsuit where the evidence and the inferences reasonably arising therefrom are legally sufficient to prove the allegations of the plaintiff's declaration, complaint, or petition."

This court has adopted the views expressed by the texts above stated for in the case of Boyle vs. Mountford, 39 Wyo. 141, 147; 270 P. 537, it was said:

"A motion for judgment at the close of the plaintiff's case is in the nature of a demurrer to the evidence, and admits its truth."

This language has been quoted with approval in later

decisions of this court, viz: Northwest States Utilities Co. vs. Brouilette 51 Wyo. 132, 65 P. (2d) 223; Brown vs. Wyoming Butane Gas Company, 66 Wyo. 67, 205 P. (2d) 116; Chandler vs. Dugan, Wyoming, 251 P. (2d) 580.

In the Brouilette and Brown cases supra the following language excerpted from 64 C.J. 432, 433, § 426, is also quoted with approval.

"By moving for a directed verdict, the maker of the motion admits the truth of whatever competent evidence the opposing party has introduced, and indeed, of all opposing evidence, or evidence on behalf or in favor of the adverse party, or facts stated in the evidence adduced, not only of all that the testimony proves, but of every material or ultimate fact which it tends to prove, in the slightest degree, together with all fair and reasonable inferences or conclusions of fact favorable to the adverse party, fairly or reasonably inferable or deducible therefrom by a jury."

Supplementing what is said in the text last cited it is again said in 64 C.J. 382 to 385, § 377, that:

"The evidence of the party against whom the demurrer is directed should be given full credence. It is considered in the light most favorable to him and most strongly against demurrant. A demurrer to evidence admits the truth of all the evidence introduced and of all facts which it tends to establish together with such inferences which men of average intelligence and fairness might legitimately deduce from the evidence and such conclusions as may reasonably be drawn therefrom."

In 4 C.J. p. 762, § 2706, the same text, concerning an appeal from a judgment of dismissal for alleged insufficiency of evidence at the close of plaintiff's case further says:

"On appeal from a judgment of dismissal of the bill, petition, or complaint at the close of plaintiff's case,

the evidence must be considered and reviewed in the light most favorable to plaintiff."

With these authorities before us we will now briefly examine in their light the evidence submitted to the trial court by the plaintiff and upon which that court directed a judgment of dismissal.

Counsel for plaintiff attempted to have the plaintiff testify in the case but upon objection from counsel for defendants "to the introduction of any testimony whatever upon the part of this witness for the reason that the witness is a party to the suit and the defendant defends as an executor and heir grantee, assignee and legatee of the deceased person and this comes squarely under the Complocency (Competency), Privilege, Communication Act, Section 3-2603 of the Wyoming Compiled Statutes," the court sustained the objection. The court made no effort to ascertain what testimony plaintiff's counsel desired to elicit from this witness although the Statute 3-2603 W.C.S. 1945 contains no absolute and unlimited prohibition of a party but has no less than nine or ten exceptions detailing when the prohibition contained in the first paragraph of said section which declares it shall not apply. The same witness later on in the trial was, as we shall see, recalled, but was told by the court that she could not testify.

On direct examination Walter Hawkey, the husband of the plaintiff testified: "Q. That was during the first war, then. At the present time, as of this date, are the only surviving children of Al Williams and Nona Williams in this Court room? That is, the plaintiff and the defendant? A. As far as I know. * * * Q. Within a year or so after this date, on May 8, 1934, did you have occasion to appear in Mr. Kinsley's office and overhear a conversation between Mr. Kinsley and the plaintiff? A. Yes sir. Q Now, will you please tell the Court what transpired prior to going to this office? What was the

occasion for going in there? That is, what had you and the plaintiff done prior to that? A. Well, we had been to see another lawyer. Q. And what did you go to see the other lawyer for? A. Well, on this (indicating). Q. On the quitclaim deed? A. Assignment, quitclaim deed; whatever you call it. * * * Q. Why did you and the plaintiff, Ethel Hawkey, go to the attorney's office? A. Why, I think my wife had been to see Mr. Kinsley about it. Q. She went to see Mr. Kinsley first? A. Yes. Q. And what then? Later on she went to—who was the attorney you went to see? A. Mr. McNally. * * * Q. Did the plaintiff and you try to do anything about this quitclaim deed? A. Not after what Mr. Kinsley told us, we didn't. * * * Q. Will you proceed to tell what Mr. Kinsley said in regard to whatever you were talking about? A. Why, we went in to see Mr. McNally, then we went to see Mr. Kinsley afterward—a week or ten days, I should say; I couldn't remember just the amount of time—and Mr. McNally said that I didn't need to worry; that Aunt Nona had made a will dividing the property equally amongst the two children. Q. By 'two children', you mean . . . ? A. Jennie and Ethel Williams. Q. And at that time was it the purpose of this visit to see Mr. McNally to see about recovering this one-third interest of property? A. At the time we went to see Mr. McNally it was. Q. That was the purpose? A. Yes. * * * Q. Then, subsequently or soon thereafter, was this ratified and confirmed by Nona Williams? A. Yes, sir. Q. Will you please tell the Court when and where Nona Williams made any statement in regard to how she was going to leave the property? A. Well, it was made at her residence. Q. That was out on Piney? A. On Piney. Q. And do you recall the year or approximate date? A. As near as I can remember, it was in '36. Q. 1936? Please tell the Court—now, first, was this conversation in the presence of the plaintiff? A. Yes, it was. Q. And please tell the Court what Nona

Williams said? A. Why, she said that Ethel didn't need to worry; that she would divide the property to both children and they'd be well taken care of. Q. Did she make any mention of a will? A. Yes, she said she left a will. Q. Did she say how that will provided? A. She said it would be divided equally. Q. And did you or Ethel thereafter make any attempt to see any more attorneys or do anything about this quitclaim deed? A. No. Q. You let the matter drop? A. That's right. Q. You didn't do any more? A. Didn't do any more. Q. And that was in reliance upon the statement that were made by counsel and Mrs. Nona Williams. A. That's right. Q. Do you remember what month that was, Mr. Hawkey? A. No I can't remember the month. I think it was sometime in the warm months of the year; summertime. Q. It was summertime? A. It was my recollection that it was. Q. Of '36? A. That's right. Q. Now, was that before or after you talked with Mr. Kinsley? A. That was after we had talked to Mr. Kinsley. * * * Q. The Eva Williams Place was sold? A. It was my understanding it was sold."

On cross-examination the same witness stated: "Q. Mr. Hawkey, you say that that conversation with Mrs. Williams was sometime in the year 1936? A. Yes, sir. Q. Can you recall within a certainty as to when that was; what part of the year other than the summer months? A. Along in the middle of summer, if I remember right. Q. And what was the occasion for this conversation? Why did it come up? Was it at the solicitation of yourself and Mrs. Hawkey? A. Aunt Nona sent word to my wife and I that she wanted to talk to us; to come over and see her. That was the occasion. Q. I see, and in response to her request you went over. And who brought this conversation up with reference to division of this property? A. She brought it up herself. Aunt Nona brought it up herself. Q. Tell

the Court again just what that conversation was. A. Well, it come around that she had told Ethel that she didn't need to worry; that she had divided the property equally between the two children; that would be Ethel and Jennie. Q. I see, and that was the gist of the conversation as near as you can recall it at the present time? A. That's right."

Mrs. Fred Todd, a neighbor and friend of the Williams family on direct examination stated: "Q. And you have always been a very close friend of the Al Williams family? A. Yes. I should say so. Q. And directing your attention to a period of time after Al Williams' death, did you have occasion to talk with Mrs. Nona Williams in regard to the Al Williams Estate? A. Yes. Q. Will you please tell the Court where and when this conversation took place? A. Well, it was at one of our Club Meetings and I cannot give the date any more than it was probably two years after Mr. Williams died, I'd say. Q. Approximately two years after Allen Williams died? A. Approximately two years. Q. Now, Al Williams died on May 11, 1934. Would that make this in the year 1936, would you believe? A. I would say so; '36. Q. And do you recall where this meeting was when you had this conversation? A. No. I cannot recall it definitely. Q. Now, did Mrs. Williams say anything to you about the daughters making any conveyance to her? A. Yes. Q. What did she tell you? Please tell the Court the substance of the conversation you had with Nona Williams, in your own words. A. Well, she said that Mr. Williams had left the estate divided into thirds; a third for Jennie, a third for Ethel and a third for herself. Q. And what did she say about that? A. She said 'I don't see how we can divide the ranch up into thirds. It would be inconvenient and I don't see how we can do it.' Q. She said it just couldn't be done? A. And so she said that Ethel had

agreed to let her use her third as long as she lived. Q. Did she say anything about Miss Jennie Williams also agreeing? A. No, not that I remember that she said anything about Jennie. Q. She just mentioned Miss, rather, Mrs. Hawkey? A. She just mentioned Ethel and then she said, 'Of course, when I am gone, why the two girls can divide it equally because there is just the two of them. There is two ranches, two buildings, two homes and,' she said, 'they can divide it equally or at least,' she said, 'Ethel will get it; she will get her third back,' and she said, 'I am keeping all the income from her third and she will also get that,' and I don't remember just anything more. Q. Was that the sum and substance as you recollect the conversation with Nona? A. Yes, I think so."

Plaintiff's exhibit "9" was received in evidence without objection and it reads:

"Feb. 21, 1938

Banner, Wyo.

Ethel:

Today I have changed my will. You don't recognize me as a mother so why should you be remembered when I am gone. I've stood it as long as I can. Even trying to turn the children against me. I have done nothing to be sorry for.

Mamma."

Concerning this exhibit the plaintiff testified: "Q. Mrs. Hawkey, I hand you Plaintiff's Exhibit marked No. 9, for identification together with the envelope, also so marked . . . "

Counsel for defendants then said: "We object to any testimony whatever on the part of this witness for the same reasons that we argued when this case started."

"THE COURT: Very well. She may testify. Defendant excepts." "Q. When did you receive that document? A. I received this about the third week after my mother's death. Q. Well now, your mother died on March 19, 1951. * * * When would you say that that letter was delivered to you? A. About the 15th of April. Q. About the 15th day of April? A. (Nodding.)"

Mrs. Mary Culver as a witness for the plaintiff testified: "Q. And how long have you known the plaintiff, Ethel Hawkey,, and the defendant, Miss Jennie Williams? A .Ever since they were little girls. Q. And you knew their mother, Nona Williams? A. Yes. Q. And their father, Al Williams? A. Yes. Q. Are you familiar with the ranch? A. Yes. Q. What is known as the Al Williams ranch? A. Yes. Q. Where did you live in reference to that ranch? A. Well, we were about 3 miles when they had the one ranch but I guess probably a mile west. Q. A mile west? A. Yes. Q. And did you belong to this Piney Woman's Club? A. Yes, I did for a while. Q. And did you ever have occasion to talk to Nona Williams in regard to the Al Williams Ranch property? A. Yes, I did. Q. Do you remember when and where that conversation took place? A. Well, the Club met at our ranch and Mrs. Williams and a lady, another lady from Ucross, Mrs. Dormand, we sat out on the porch and she told us about the girls signing over their rights so she could run the place because she said it couldn't be divided. She had a few cattle of her own; she wanted a place to run them and she said, 'When I am gone, they will both be provided for.' Q. Then she stated that the two daughters had conveyed their interest to her? A. Yes, she said, 'I have amply provided for both.' *ᵢ * * Q. Anything else said at this conversation, Mrs. Culver? A. She also said, 'That I am not touching any of the money that comes from the cattle. I have a few dollars from some milk cows that

I am living on and my chickens.' Q. And did she say who this property was to go to? A. It was to go to the girls. * * * And was anything else said at the conversation, Mrs. Culver, that you recall? A. No, not pertaining to this certain thing. I think she just gave us— told us—that the girls, after she was gone, would be provided for, both of them, and that she wasn't touching the cattle or the money that came from them and so that could be divided after she had gone. She was making her own living off of her chickens and a few cattle that she had."

On cross-examination this witness stated that conversation detailed above occurred in 1935. Counsel for plaintiff thereafter stated to the court: "If the Court please, I would like to recall Ethel Hawkey to testify to matters that have no relation whatever with transactions as to the decedent. This matter pertains to this situation that transpired after the death of Nona." The Court stated: "The objection still stands that she cannot testify. Plaintiff excepts." Counsel for plaintiff thereupon stated to the Court: "If the Court please, I'd like to call the defendant Jennie Williams, to the witness stand to testify on a matter which has no connection with any conversations with the decedent." Counsel for defendants at this time interposed: "Same objection as made several times before." This objection the Court sustained allowing plaintiff an exception. Counsel for plaintiff made an offer of proof wherein he offered to prove by the defendant, Jennie Williams, that she wrote a letter dated May 2nd, 1943, which was sent to plaintiff. That letter reading:

"Dear Ethel: When did you decide that you had done the wrong thing in making it possible for Mamma to have the use of the property while she was alive?" and further down in the letter,

"I doubt if you really believe that I have been drawing money from the estate all this time although I know that you have given people this impression. But if you think it is true you have no grounds for it and you should be put straight about it."

To this offer counsel for defendants objected as "incompetent, irrelevant and immaterial", which objection the court sustained and denied the offer of proof. To this ruling of the court plaintiff reserved her exception, and the ruling will be considered infra.

H. Glenn Kinsley, one of the attorneys for the defendants was called as a witness for the plaintiff and testified without objection in the course of his direct examination: That he was a cousin of Mrs. Nona Williams; that he does not recall who prepared the assignment of the interest that Miss Jennie Williams and Mrs. Ethel Hawkey had in the Allen Williams estate and he does not recall their signing that instrument; that he, as attorney, probated the Allen Williams estate and will; that he does not recall how Williams left his property; that: "Q. You knew that the will did leave the property equally to the mother and the two children? A. I undoubtedly knew it at the time, of course. Q. And did you know anything about the assignment and the quitclaim deed, wherein they deeded all,—that is, any assignment—they assigned all their right, title and interest to the mother and in the quitclaim deed they deeded all of their right, title and interest in the real estate described in the inventory to their mother? A. I told you all I know about the assignment. Q. Do you know anything about the quitclaim deed? A. Well, I don't remember it. I can't tell you about it from memory but I don't question but there was a quitclaim deed because I'm sure there was. I think it is in evidence too, isn't it? Q. Well, to refresh your memory, it is set out in your Answer. A. Well, its admitted in the Pleadings here isn't it? Q. Yes, its

admitted in the Reply. Now, was that deed prepared in your office, that is, the original of that deed? A. Well, I have no independent recollection of whether it was or wasn't. I'm sure that the deed is all right. Its signed by Jennie Williams and Ethel Hawkey. I don't question that. Q. I was wondering who prepared the deed? A. I don't know. That is a long time ago."

Kinsley also stated that he prepared Allen Williams' will; that he does not recall whether he prepared the assignment of plaintiff's and Jennie's interest in the Allen Williams estate to their mother and that: "Q. But do you remember whether you prepared the quitclaim deed or not? A. I do not. I have no recollection about it other than that I am sure there was such a deed because it is there. * * * Q. Did the plaintiff in this case, Ethel Hawkey, come to your office on the 28th day of May, 1934? A. I certainly could not recall that whether she did or did not. She was there many times; not lots of times but on several different occasions. Q. Now, on one occasion do you recall an occasion where she asked you what the papers were that she signed when she was in your office and signed the assignment and quitclaim deed A. No, I don't remember that, certainly. Q. Do you remember her employing an attorney to set aside that deed? A. No, I do not. I don't know this minute whether she ever employed an attorney or not. She never told me that she had. Q. You heard this conversation that is the testimony of Mr. Hawkey? Do you recall stating to Mrs. Hawkey in your office that there was no use doing anything about this because Nona had made a will leaving the property equally? A. I do not recall that at all. I don't say that I wasn't there or was probably there at some time. What was said I don't remember. I am not going to tell the Court that I remember something that I do not remember. Q. You don't remember that? A. No, I do not . *, * * Q. Were

you cognizant of the fact that Miss Jennie Williams and Mrs. Ethel Hawkey had conveyed their entire interest, one-third interest in the estate, to the mother? A. Well, that was my understanding, sure. Q. And what was your understanding of what Nona Williams agreed to do in return for this? A. There was absolutely no agreement that I know anything about or ever heard of from her or anybody that really knew. I certainly was never present. Q. Who asked that these papers be prepared: the quitclaim deed, assignment and the petition for the probate of the will of Al Williams? A. I do not know. I have no idea. You must remember that's been 18 or 19 years ago. I don't remember. Q. Were you acting as attorney for Nona Williams when you were probating this estate? A. Which estate? Q. The Al Williams estate? A. Well, if she was the executrix, I certainly was. I probated the estate though, as personal representative, I think she was. Q. Well, you remember the Al Williams will or at least you remember that you did make a will? A. Yes. * * * Q. Now, at the time you probated the estate for Al Williams and acting as attorney for Mrs. Nona Williams, did you also act as attorney for Miss Jennie Williams and Mrs. Ethel Hawkey? A. I don't know. I don't remember. They were just relatives of mine that stopped into the office. I probably prepared some papers for them. I don't remember anything about that. Q. Was no other attorney for them preparing papers for them during the course of— A. Well, that is the argument. I don't know. Q. And did Nona discuss getting this ranch for her use during her life with you? A. I don't recall it. Q. You don't recall it? A. No. Q. Well, now, on the 28th day of May, 1934, were you acting as attorney for Jennie Williams, Ethel Hawkey and Mrs. Nona Williams? A. I don't know whether I was or not. I don't know what I was doing that day. That's a long time ago. Q. To refresh your memory,

Mr. Kinsley, at the time the petition for probate of the will was filed, you swore under oath as follows: 'H. Glenn Kinsley, being first duly sworn according to law, on his oath deposes and says: That he is attorney for the above named Petitioners; that he has read the above and foregoing petition and knows the contents thereof . . . ', etc. etc. etc., and that petition is signed by Nona Williams and Ethel Hawkey. Were you acting as their attorney on that day? A. I signed that. That is my signature. Q. Then, does that refresh your memory sufficient to give an explanation as to what transpired in your office when the girls gave up all their interest in this property and the mother made a will? Did the mother make a will? A. I don't know. I certainly don't remember whether she did or not. Q. You don't recall drawing a will for Nona Williams at any time? A. Oh yes. I think that I drew this will that has been admitted here. Q. How many other wills did you draw for her? A. I don't recall. Q. Do you remember drawing one will or soon after, or at the time of the— A. Apparently one was drawn but I looked for a copy and I didn't find it. Q. I asked you a couple of weeks ago to please find a copy of that will. A. Yes, but— Q. Did you search your files? A. Yes. I had a girl search too but we didn't find it. Q. Now, thinking back to this day, you are reasonably certain that all parties were in your office on that day are you not? A. I am not at all certain of that. How can anybody remember what happened in 1934? Other people can do that. I am busy every day and lots of things happen. I can't remember what happened this day last year. Q. You swore under oath that you were acting as their attorney on the 28th day of May and signed before Thelma Hotchkiss on that day and if, on that same day, there is an assignment of all the interest of the two daughters in the estate of Al Williams and it is signed on the 28th day of May, 1934, and if it is

true, as alleged in the defendants' answer, that on the 28th day of May, 1934, a quitclaim deed was duly executed on the 28th day of May, 1934, would you say that those people were all in your office that day? A. I would say nothing about it. I don't remember. Q. Now, Mr. Kinsley, you know that all these things were done in your office on the 28th day of May, 1934. * * * Q. Who was Thelma Hotchkiss? A. Well, she was a secretary of McNally's. Q. And where was McNally's office with reference to yours? A. Well, his adjoined mine. Q. And you had the same reception room, did you not? A. That's right. Q. Therefore, the secretary was in your reception room. A. She was. Q. All right. Referring to the assignment, which is on the 28th day of May, 1934, that is also signed before Thelma Hotchkiss? A. That's right. Q. Now, she was in your reception room too? A. Yes. Q. And referring to the quitclaim deed, which is set up in your Answer, that is signed in the presence of Thelma Hotchkiss on the 28th day of May, 1934? A. Well, the copy appears to be. Q. Therefore, isn't it apparent to you that all these people were in your office on that day? A. Nothing is apparent to me. All I can say is I don't remember whether they were or not. Now, that is a matter for you to argue. I am not going to say that they were because I don't have any independent recollection. Q. But the record indicates that they were in your office and do you remember any discussion in regard to the assignment? A. I do not. Q. Do you remember any discussion in regard to the quitclaim deed that was signed on that date, the 28th day of May? A. No * * * — Q. Are you familiar with Nona Williams' handwriting? A. No, I am not. Q. Do you know whether that is or is not? A. You might think it strange but I don't remember that Nona Williams ever wrote me a letter in longhand. She is a cousin of mine. She came to the office and I have done business for her

different times but as far as knowing her handwriting, so help me God! I couldn't tell you whether that was Nona's handwriting or somebody else's. Q. Here she says, 'Today I have changed my will.' Now, what was in this will that she changed? A. I don't know. Q. You don't remember? A. *I remember what was in it.* (Italics supplied.) Q. The will could have left the property equally, as you stated? A. Yes, and it probably did. I didn't say that it didn't at all. Don't get me wrong there. She said that she changed it and she undoubtedly did. Q. She undoubtedly had to have another will or that will couldn't have been changed, is that correct? A. Correct. * * * Q. In the year 1934, do you recall drawing up a will for Nona Williams, wherein she devised and bequeathed all her property, real, personal or otherwise to her beloved daughters, Miss Jennie Williams and Mrs. Ethel Hawkey? A. I do not recall. Now, I want you to understand that I do not recall. But I would like to make a statement to the Court, if I may, to explain why I don't recall these things. I am extremely busy every day and work every day. Since then I have been in the office just working hard and I had to handle a lot of things for a lot of people and to sit up here today and say whether I remember who was in my office 18 or 20 years ago and exactly what a particular instrument contained, I am not going to say that I remember because I don't remember; that is the honest truth about it. Q. Well, you have admitted that you believe that she did make another will. A. Well, she says right there—presumably that is her handwriting—she says she made another will and I think she undoubtedly did. In fact, I am quite sure she did. I looked for another will and searched the records but I can't find it. Q. It's been lost then? A. I don't say what's happened to it. Maybe it's been destroyed. Usually they make a new will and destroy the old one. Q. Well, Mr. Kinsley, what I want to prove is the con-

tents of that destroyed will. A. You can't prove it by me; I swear that. Q. You cannot recall how the property was left prior to the change that was made, is that true? A. I do not recall. I am not questioning but what it is probably the way you are trying to prove it was. Maybe it was to the two girls equally. I am not going to swear to it because I don't know. Q. I mean, considering the fact that the two girls— A. That is a matter of consideration for the attorney. Q. This is a matter that you are competent to answer in view of the fact that the two girls conveyed all their interest in the property to their mother on the 28th day of May, 1934, is it no reasonable to conclude that she did make a will leaving the property—referring to the Al Williams Ranch properties that she received by virtue of the assignment and quitclaim deed and the daughters —to the two daughters equally? A. Well, that is conclusion and opinion and I don't say that I have any opinion one way or the other. It could have been that way or some other way. * * * Q. Do you recall any discussions, Mr. Kinsley, with Jennie Williams and Mrs. Ethel Hawkey after the death of Nona Williams? A. No, I don't recall any discussions between them. Q. Did Ethel contact you after her mother's death? A. Well, I won't say she didn't. She might have been in the office but I don't know what you mean. I don't recall. * * * Q. Well, when did you deliver this note to Ethel? A. After the death of Nona. Q. That was done in your office, was it not? A. I think so. Q. Well, then you do remember her being in your office? A. I told you just a minute ago that she was there several times. Q. Do you know what Ethel came to your office for on that occasion? A. I don't know. I suppose she came in connection with this estate of the will, if she came. I am quite sure she was up there once or twice. Q. And do you remember what you said to her? A. No, I don't. Q. Isn't it a fact that you told her that you would call

Jennie Williams up and have her come in the office and adjust this? A. I know I didn't say that because there wasn't anything to adjust as far as I was concerned. Q. Now, what other occasions do you recall when Ethel Hawkey came to your office between 1936 and 1940? * * * Q. Do you recall having a discussion with Ethel Hawkey's attorney in regard to the quitclaim deed, which was signed by Ethel Hawkey and Jennie Williams on the28th day of May, 1934? A. I certainly do not recall it. I don't even know who their attorney was. Q. Well, to refresh your memory, did you ever have any discussion with Mr. McNally about it? A. No, I never did. Q. Do you recall the time when Ethel came into your office, either in the early part of '36 or maybe it was in the summer, probably in the early part of 1936, and told you that they were going to set aside this quitclaim deed? Do you remember that? A. No, I don't. Q. You don't recall that? A. No. Q. And do you recall telling them that there was no use doing anything about this because Nona had left the property equally to the two daughters? A. I don't recall anything about that. Q. You could have made the statement, could you not? A. I might have. If that was in her will, I might have said that. * * * Q. Do you remember in the early part of the summer of 1936 a discussion in your office with Walter Hawkey and Ethel Hawkey in regard to the quitclaim deed that was signed on the 28th day of May, 1934, wherein Ethel Hawkey and Jennie Williams transferred their interest in the Al Williams Estate to Nona Williams? A. No, Jack, I don't remember. I don't think it ever happened. I haven't the slightest recollection."

Plaintiff on objection by defendants' counsel was not allowed to testify at all when she was requested by her counsel to take the witness stand. No offer of proof was made.

Walter Hawkey, recalled as a witness stated: "Q. Will you please answer the question? The question was: What did the attorney say—Mr. McNally—what did he say? A. He said that Judge Burgess would throw the assignment and quitclaim deed out of the window as soon as he heard this case. Q. What did Ethel then state that she was going to do? A. Why, she said we'd talk it over and then we told them we'd go in and see Mr. Kinsley about it. Q. Had she decided to file suit? A. Oh, yes. She decided to file suit. Q. And then did you have a discussion in Mr. Kinsley's office? A. Yes. Q. Did Mr. Kinsley know that Ethel was going to have McNally sue to set aside this quitclaim deed? A. He stated this: that he had a case. Q. And what did Mr. Kinsley say? A. He said that 'it wasn't any use to have a suit' or words to that effect, 'because Aunt Nona had divided the property equally between the two youngsters.' * * * Q. Then did Ethel state that she—well, in the record you testified that later on you saw Nona in regard to this same matter; that is, Mrs. Nona Williams? A. That's right. Q. And after discussing this with Mr. Kinsley and with Nona Williams did Ethel drop all proceedings relative to contesting the legality of that quit-claim deed that she had signed on the 28th day of May? A. That's right, sir."

Referring now to the facts and authorities reviewed supra relative to the matter of the judgment of dismissal upon the close of plaintiff's cause and taking that evidence as true with all the reasonable inferences and intendments to be drawn from it, the fact is, it seems to us as the record now stands, quite clear that Allen Williams left a will devising and bequeathing his property to his wife and his two daughters, Jennie and Ethel, one-third in said estate to each; that after his death his widow, Nona, concluded that this property as devised and bequeathed could not be so divided to the

advantage of the legatees and she accordingly induced her two daughters, Jennie and Ethel, to transfer to her their respective interests therein which had been thus left to them by the will of Allen Williams; that the two daughters acquiesced in her desires in this respect and made the necessary transfers to their mother; that accordingly the mother agreed to and did make a will leaving all this property real and personal to Jennie and Ethel in equal shares to each; that this will remained intact and undisturbed for several years; that on February 21, 1938, the mother changed her will leaving all the property she possessed to her daughter Jennie and the sum of $1.00 to her daughter Ethel. That the latter was not informed of that change until the probate of Nona's last will. Under the situation thus presented which supports the cause of action pleaded in plaintiff's petition this court is constrained to enter an order reversing the judgment herein in question and remanding the case to the District Court of Sheridan County with instructions to overrule the defendants' motion to dismiss, and to set aside the judgment in their favor.

However, in the event the cause should be retried there are some rulings of the trial court which we are required to notice in order that an erroneous disposition of the questions that may arise may be avoided. As before stated counsel endeavored to have Ethel Hawkey recalled to testify as he told the court "to matters that have no relation whatever with transactions as to the decedent. This matter pertains to this situation that transpired after the death of Nona," but the Court ruled "the objection still stands that she cannot testify." This was prejudicial error when the Statute involved, Section 3-2603 W.C.S. 1945 is examined. That section reads so far as is pertinent here:

"3-2603. Conditions under which party to action may

not testify: A party shall not testify where the adverse party is the guardian or trustee of either a deaf and dumb or an insane person, or of a child of a deceased person, or is an executor or administrator, or claims or defends as heir, grantee, assignee, devisee or legatee of a deceased person, except:

"(1) To facts which occurred subsequent to the appointment of the guardian or trustee of an insane person, and, *in other cases, subsequent to the time the decedent, grantor, assignor or testator died;* * * *

"Nothing in this section contained shall apply to actions for causing death, or *actions or proceedings involving the validity of a deed,* will, or codicil;" * * * (Italics supplied.)

In York vs. James, 60 Wyo. 222, 148 P. (2d) 596, 600, this court said:

"The judgment herein must, accordingly, be reversed and remanded to the District Court for a new trial. We might incidentally mention the fact, since the point arose in the trial below, that Section 89-1704 Rev. St. 1931, which prohibits parties from testifying in certain cases, does not prohibit them from testifying in cases which involve the invalidity of a conveyance, for that section, at its end, specifically provides that 'nothing in this section contained shall apply to actions for causing death, or actions or proceedings involving the validity of a deed, will or codicil,' etc. See 70 C.J. 222, 223, 309."

Section 3-2604 W.C.S. 1945 after stating that:

"No person shall be disqualified as a witness in any action or proceeding, civil or criminal, by reason of his interest in the event of the same, as a party or otherwise; and every person shall be in every such case a competent witness, except as otherwise provided in this chapter."

The section then continues:

"Any person who is a party of record in any civil action or proceeding, or any person for whose immediate benefit any such action or proceeding is prosecuted or defended, or his or its assignor, officer, agent, or employe,

or the person who was such officer, agent, or employe at the time of the occurrence of the facts made the subject of the examination, or in case a county, town, village, or city be a party, any officer of such county, town, village, or city, may be examined upon the trial of any such action or proceeding as if under cross-examination, at the instance of adverse party or parties or any of them, and for that purpose may be compelled, in the same manner and subject to the same rules for examination as any other witness, to testify; but the party calling for such examination shall not be concluded thereby and may rebut the evidence given thereon by counter or impeaching testimony."

Counsel for plaintiff undertook to call the defendant Jennie Williams, to the witness stand to testify on a matter which he stated had no connection with any conversation with decedent. In that connection counsel for plaintiff made an offer of proof, referred to above, reading as follows:

"Dear Ethel, When did you decide that you had done the wrong thing in making it possible for Mamma to have the use of the property while she was alive? * * * I doubt if you really believe that I have been drawing money from the estate all this time although I know that you have given people this impression. But if you think it is true you have no grounds for it and you should be put straight about it."

as set forth above. This offer of proof was objected to by counsel for defendant as "incompetent, irrelevant and immaterial," and denied by the court. We think this offer of proof should have been received, inasmuch as the proceeding before us involves the validity of a deed, the quitclaim deed given by Jennie and Ethel to their mother. The question clearly arises in the case as to whether that deed was an absolute deed or one simply to give their mother the use of the property during her lifetime. Both Ethel and Jennie were competent witnesses in the case.

As stated in York vs. James, supra, the so-called dead man's statute (Section 3-2603 W.C.S. 1945) does not apply to actions involving the validity of a deed. This letter from Jennie to Ethel quoted above in the offer of proof, as made in its first sentence thereof, throws considerable light as an admission against interest as very aptly said by Professor Wigmore in V, Wigmore on Evidence (3rd Ed.) p. 263, § 1458:

"A statement predicating of oneself *a limited interest instead of a complete title to property* asserts a fact decidedly against one's interest, and has always been so regarded. In particular, assertions that one's estate is a leasehold, not a freehold, or that one's possession is merely as agent or as trustee for another, are admissible:" (Italics already supplied.)

That first sentence, in question form, intimates, as it seems to us, that when the two daughters transferred the property to their mother, Jennie also then understood, as did Ethel, through the conveyances employed, that her mother was merely to have the use of the property "while she was alive."

However, it will be recalled that Jennie in her answer reviewed supra, now asserts that the conveyance to her mother by Ethel and Jennie was an absolute one and not one for life. And it is so contended before this court. Returning again briefly to authorities construing Section 3-2603 W.C.S. 1945; 70 C.J. p 330 § 430 asserts the rule to be:

"As a general rule, however, a party or interested witness is competent as to matters occurring after the death of deceased * * * where the statute expressly allows the witness to testify as to such matters * * *"

In Swasey vs. Ames, 79 Me. 483, 10 A. 461, the court said:

"The fact that one of the parties to a suit is the representative of a person deceased, does not preclude the

other party from the privilege of being a witness in his own behalf, respecting matters that have happened after the death of such deceased person, whether the representative party testifies or not."

It is insisted that plaintiff made no offer of proof as to what matters Ethel would testify to although her counsel told the court that they dealt with matters occurring after the death of Mrs. Nona Williams.

But in McGinness vs. State, 4 Wyo. 115, 123, 31 P. 978, we find it said:

" "* * * In other words, where the witness offered is rejected as incompetent to testify, the court will hold that the party offering the witness has been prejudiced by his exclusion, though the facts he was expected to prove are not stated, the ground of exclusion being one wholly irrespective of the subject matter of his testimony.'

"Undoubtedly the court may insist on the production of the witness, and upon proof, where it may not desire to rely upon the statement of counsel as to the purport of the evidence sought to be adduced, but it seems clear that if the court rejects the testimony upon the sole ground of the incompetency of the witness, it will be presumed that the testimony of such witness would have been material, without any statement to that effect in the record."

64 C.J. 123, § 141 states the rule as follows:

"An offer of proof is unnecessary where the offer would be a useless ceremony, or the evidence is rejected as a class, or where the court indicates such offer would be unavailing."

In Totten vs. Estate of Miller, 139 Ohio St. 29, 34; 37 N.E. (2d) 961, the Supreme Court of Ohio with a statute before it like § 3-2603 W.C.S. 1945, supra, said:

"It is further claimed that the exclusion of plaintiff as a witness was not prejudicial because there was no proffer made as to what testimony he would have given

had he been permitted to testify. But this is not necessary when the witness is excluded on the ground of his alleged incompetency and not on the ground that his proposed testimony was incompetent. Furthermore, it will be assumed that his exclusion as a witness was prejudicial."

In Torrance vs. Torrance 147 Ohio St. 169, 70 N.E. (2d) 365, the court held (See Syllabus 1) :

"Where a court rules that a witness, through whom competent evidence might otherwise have been produced, is incompetent to testify, no proffer of testimony is necessary, to challenge such a ruling of the court."

The Appellate Court of Indiana in Bowman vs. Bowman, 118 Ind. App. 137, 77 N.E. (2d) 900, 901, has recently ruled in similar fashion that:

"Appellant insists that no offer to prove was made and therefore no question can be presented here in connection with the exclusion of this testimony. Our Supreme Court has held, however, that where the objection taken is to the competency of the witness, no offer to prove is required. State vs. Hamer, 1937, 211 Ind. 570, 199 N.E. 589."

In State vs. Hamer, 211 Ind. 570, 199 N.E. 589, 594, the Supreme Court of Indiana has declared the "proper rule" in the following language:

"In the case of Sullivan, Administrator, v. Sullivan (1893) 6 Ind. App. 65, 32 N.E. 1132, 1133, the proper rule is announced, and is as follows:

" 'Where the objection is to the right of the witness to testify at all, the party introducing such witness need not state what he expects to prove by him, as the question for the court to pass upon such case is not as to the competency of his testimony, but as to the competency of the witness himself.' See State ex rel. Steigerwald v. Thomas (1887) 111 Ind. 515, 13 N.E. 35, 60 Am. Rep. 720; Sutherland et al v. Hankins et al. (1877) 56 Ind. 343, 355."

Plaintiff prays in her petition that "the plaintiff have specific performance of her agreement with Nona Williams; that plaintiff would receive one-half of all the properties known as 'the Allen Williams Ranch properties'" and other property as hereinbefore stated in our review of plaintiff's petition, but as said in 58 C.J. 1060, 1061, Sections 308 and 309:

§ 308: "While it is often stated that specific performance will be decreed as to contracts to devise or bequeath property, an agreement to make a certain disposition of property by will is one which, strictly speaking, is not capable of a specific execution.

§ 309: "However, it is within the jurisdiction of a court of equity to do what is equivalent to a specific performance of such an agreement, and such a contract may be enforced after the death of the promisor by fastening a trust on the property in the hands of heirs, devisees, and personal representatives and others holding the property with notice of the contract or as volunteers. While this remedy is more usually granted in the case of contracts relating to real property, the jurisdiction extends to contracts relating to personal property under the rule that jurisdiction to compel specific performance does not rest upon any distinction between real and personal estate, but on the ground that damages at law will not afford a complete remedy."

The Third Edition of Pomeroy's Specific Performance of Contracts, p. 490, § 191, delineates the principle set forth in 58 C.J. supra as follows:

"Courts of equity will, under special circumstances, enforce a contract to make a will or to make a certain testamentary disposition; and this may be done even when the agreement was parol, where in reliance upon the contract the promisee has changed his condition and relations, so that a refusal to complete the agreement would be a fraud upon him. The relief is granted, not by ordering a will to be made, but by regarding the property in the hands of the heirs, devisees, assignees, or representatives of the deceased promisor, as impressed with a trust in favor of the plaintiff, and by

compelling defendant, who must of course belong to some one of these classes of persons, to make such a disposition, * * *"

The well-known English text, Fry on Specific Performance (6th Ed.) § 577, p. 275, 276, also refers to the principle aforesaid in these words:

"In cases of wills obtained by a promise to dispose of the property in a particular way, the Court will, notwithstanding the language of the Statute of Frauds that every will must be in writing, and the language of the Wills Act to the same effect, give effect to the verbal arrangement by raising a trust on the property devised or bequeathed by the will."

The case of McConnell vs. Dixon, 68 Wyo. 301, 332, 333, 233 Pac. (2d) 877; had occasion to consider at length the operation of a constructive trust and it was therein said:

"In 2 Restatement of the Law of Trusts, p. 1249 it is stated: 'A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.' In 54 Am. Jur. 'Trusts', 167 Section 218 it is stated: 'A constructive trust, or as it frequently is called, a trust ex maleficio, ex delicto, a trust de son tort, or an involuntary or implied trust is a trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience hold and enjoy. It is raised by equity to satisfy the demands of justice.' And in Section 219, page 169 of the same work it is stated: 'A constructive trust is substantially an appropriate remedy against unjust enrichment. It is raised by equity in respect of property which has been acquired by fraud, or where, although acquired originally without fraud, it is against

equity that it should be retained by the person hold-ing it.' "

In Austin vs. Austin, 135 Me. 155, 191 A. 276, 277, it was held that a constructive trust was properly im-pressed upon property which they had inherited one-third to each from their mother conveyed by these brothers to their sister by quitclaim deed, an instru-ment absolute and unqualified, where the evidence clearly disclosed that the sister orally agreed when she took the property that she would make a will devising the property they had just conveyed back to her brothers. Instead of doing this she conveyed it to another brother and his wife who took the transfer knowing of the oral agreement. In upholding the decree impressing the trust upon the property for a return to the brothers of the property they had con-veyed to their sister, the Court said:

"* * * it is well settled in this state that: (1) Where real estate is conveyed upon the faith of the promise of a grantee to make a will devising it to the grantor and failure to do so would be a fraud, equity raises a constructive trust and declares that the grantee holds the property so impressed. (Citing many cases.) And (2) the trust thus impressed follows the real estate into the hands of any subsequent holder who is not a bona fide purchaser thereof without notice."

The fourth ground of the defendants' motion to dis-miss as above set forth was based, as we have seen, upon the failure on the part of the plaintiff or anyone in her behalf to file a creditor's claim as directed by statute, in the estate of Nona Williams, deceased, but such filing under the circumstances disclosed by this record was unnecessary. In Page on Wills (Lifetime Edition) Vol. 4, the learned author says on page 935, § 1756:

"According to the weight of authority, such a contract need not be presented to the executor under the terms

of such statutes. In most of these cases the promisee wishes to have the heirs, devisees, etc., declared to be trustees for him; and the courts have generally held that this is not a claim within the meaning of the statute, and that the promisee is not a creditor within the meaning of the statute. This result has been reached under a contract between the promisor to leave to the promisee all of the promisor's property or a *certain fraction thereof, or under a contract to devise specific property.*" (Italics supplied.)

It will be understood that what is said herein, is grounded upon the record now before us. If other matters should appear later which would materially change the factual situation then the trial court can very well mold properly the relief granted to meet the changed conditions.

Our conclusion therefore is as already intimated that the judgment below should be reversed and the cause remanded with instructions to overrule the aforesaid motion to dismiss and for such further proceedings as the parties may desire to pursue and not inconsistent with the views herein expressed and as justice may require.

*Reversed and Remanded With Instructions.*

BLUME, C. J., and HARNSBERGER, J. Concur.